John E. Hoffman, Jr., United States Bankruptcy Judge
I. Introduction
This case pits Chapter 11 debtor ASPC Corp. (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee") against firearms manufacturer Smith & Wesson Corp. ("S & W") and one of S & W's distributors, Ellett Brothers, LLC ("Ellett"). Earlier in the case, Ellett entered into an asset purchase agreement with the Debtor (the "APA") for the primary purpose of purchasing the Debtor's real estate and information technology assets, including related contracts and leases. After the Court entered an order approving the APA (the "Sale Order") and the sale closed, Ellett filed a notice designating the Debtor's firearms distribution agreement with S & W (the "Distributor Agreement") as a contract to be assumed by the Debtor and assigned to Ellett under the APA and the Sale Order. S & W supports the designation of the Distributor Agreement for assumption and assignment. The Debtor and the Committee, however, oppose the designation while decrying the unusual manner in which it was made. Ellett, which was a party to its own distribution agreement with S & W, never expressed any interest in the Distributor Agreement or similar agreements with other manufacturers during the negotiations over the APA. In fact, even after S & W pressured Ellett to designate the Distributor Agreement for assumption and assignment shortly before the sale hearing, Ellett resisted, relenting only after S & W agreed to reimburse it for the attorneys' fees and expenses it would incur in connection with the designation and to give it more than $ 155,000 of additional value. S & W agreed to these concessions for one primary reason: it intends to interpose the assumption and assignment of the Distributor Agreement as a complete defense to the $ 4.2 million preference claim that the Debtor has asserted against it.
The Debtor and the Committee contend that the elimination of a multimillion-dollar preference claim is reason enough for the Court to decline to approve the assumption and assignment of the Distributor Agreement.
*772 For their part, S & W and Ellett insist that the consequences of the assignment are irrelevant because the APA afforded Ellett the absolute right to decide which executory contracts would be assumed and assigned. In response, the Debtor and the Committee argue that the APA should not be interpreted to have bargained away the Debtor's business judgment and that the Distributor Agreement cannot be assumed and assigned in any event because it is not an executory contract.
For the reasons explained below, the assumption and assignment of the Distributor Agreement cannot be approved even though it is indeed an executory contract that Ellett at one time had the unfettered right to designate for assignment. Under the terms of the APA, Ellett had this right only up until two days before the closing. Ellett, however, failed to designate the Distributor Agreement for assignment before the deadline. And, as the Debtor and the Committee point out, the Sale Order included a provision negotiated by the parties that carved the Distributor Agreement out of the APA's process for assuming and assigning contracts. Under this agreed provision, Ellett's designation of the Distributor Agreement for assumption and assignment was subject to the rights of parties in interest to object "for any reason, including, but not limited to, challenging whether the [Distributor Agreement] is a contract that can be assumed and assigned under section 365 of the Bankruptcy Code."
In light of this agreed provision, S & W and Ellett are left to argue that the phrase "for any reason" does not mean what it says, but instead essentially means "for any reason that a party in interest could have objected if Ellett had designated the Distributor Agreement for assumption and assignment within the time period originally contemplated by the APA." This argument is unpersuasive. It is not, after all, a court's role to add language to an agreed order that simply is not there, and the language that is used in the Sale Order unambiguously permits the Debtor and the Committee to object to the assumption and assignment of the Distributor Agreement on the grounds they have asserted. Moreover, even if the Sale Order were ambiguous in this regard, extrinsic evidence demonstrates that the "for any reason" language of the Sale Order was intended to encompass the objections raised by the Debtor and the Committee. In the end, it is clear that the assumption and assignment of the Distributor Agreement would harm the bankruptcy estate in a significant way and that the Debtor's and the Committee's objections to the assumption and assignment accordingly must be sustained.
II. Jurisdiction and Constitutional Authority
The Court has jurisdiction to hear and determine this contested matter under 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. See 28 U.S.C. § 157(b)(2)(A) & (O). Because a dispute over the assumption and assignment of an executory contract "stems from the bankruptcy itself," the Court also has the constitutional authority to enter a final order in this matter. Barbara Capital Lofts, LLC v. Jaytee LLC (In re Jaytee LLC) , No. 16-00723, 2017 WL 1653153, at *3 (Bankr. N.D. Ill. May 1, 2017) (quoting Stern v. Marshall , 564 U.S. 462, 499, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) ). Further, the adjudication of the parties' dispute turns on the meaning of the Sale Order and the APA, which the Court has the constitutional authority to interpret and enforce. See *773 Trusky v. Gen. Motors Co. (In re Motors Liquidation Co.) , No. 12-09803 (REG), 2013 WL 620281, at *12 (Bankr. S.D.N.Y. Feb. 19, 2013) ("I plainly have the constitutional power, even after [ Stern v. Marshall ], to interpret and enforce my Sale Order, and the underlying agreements which I authorized in connection with that order[.]").
III. Procedural Background
On May 1, 2018 (the "Petition Date"), the Debtor, which was then known as AcuSport Corporation, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Just two months later, on June 29, 2018, the transactions authorized by the Sale Order closed. Ex. 10 (notice of closing). The Sale Order (Ex. 5) established deadlines for Ellett to designate the Distributor Agreement for assumption and assignment and for any party in interest to object to the designation. Ellett timely filed a notice designating the Distributor Agreement for assumption and assignment (the "Notice of Designation") (Ex. 13). The Debtor and the Committee timely filed objections to the Notice of Designation. Exs. 14 & 15, respectively.
In accordance with the procedures set forth in the Sale Order, the Court entered a scheduling order (Ex. 17, Doc. 369) establishing a briefing and discovery schedule and setting an evidentiary hearing on the Notice of Designation. Pre-hearing briefs were filed by the Debtor ("Debtor's Pre-Hr'g Br.") (Doc. 384), S & W ("S & W's Pre-Hr'g Br.") (Doc. 385), the Committee (Doc. 388), and Ellett (Doc. 389). The parties also submitted declarations in support of their positions. S & W submitted the declaration of Deana McPherson (the "McPherson Declaration") (Doc. 386), who is the chief accounting officer and corporate controller of American Outdoor Brands, the parent company of S & W. McPherson Decl. ¶ 1. Ellett filed the declaration of Bradley P. Johnson (the "Johnson Declaration") (Doc. 389, App. I), who is the chief executive officer and chairman of the board of directors of United Sporting Companies, the parent of Ellett. Johnson Decl. ¶ 1. The Debtor offered several declarations: the declaration of James Broering (the "Broering Declaration") (Debtor's Pre-Hr'g Br., Ex. B), the president and chief operating officer of the Debtor; the declaration of Lee Sweigart (the "Sweigart Declaration") (Id. , Ex. D), its chief restructuring officer; and the declaration of Geoffrey Frankel (the "Frankel Declaration") (Id. , Ex. E), the professional at Huron Transaction Advisory ("Huron") who provided the Debtor with investment-banking services in connection with the sale of its assets to Ellett.
The parties agreed during the evidentiary hearing on the Notice of Designation that the declarations filed before the hearing would be admitted into evidence and considered by the Court in lieu of direct testimony, but that Mr. Johnson would be permitted to provide additional direct testimony. See Doc. 451 (the "Transcript") at 7-11, 150. The Court then heard the testimony of Ms. McPherson and Messrs. Frankel, Broering, Sweigart, and Johnson. The parties also offered documentary evidence. Exhibits 1-23 of Ellett and S & W were admitted into evidence without objection, as were the following exhibits of the Debtor and the Committee: Exhibits A, D-F, H-U, Y, Z, and AA.[1] Id. at 185-87. In addition, for the reasons stated on the record, emails sent by Sue Cupero (who was an employee of S & W) to Mary Grim *774 (who was an employee of the Debtor) contained in the Debtor's and the Committee's Exhibits W and X were admitted into evidence over the objections of Ellett and S & W, but the emails from Ms. Grim to Ms. Cupero contained in those exhibits were not admitted. Id. at 156-64. The deposition transcripts submitted by the Debtor and the Committee as Exhibits B, C, G, and V were admitted for purposes of impeachment only. Id. at 185.
After the hearing, the parties filed stipulations of fact (the "Stipulations") (Doc. 420). Post-hearing briefing was completed on January 31, 2019, with the Debtor, Ellett, the Committee, and S & W all filing briefs. See Doc. 525 ("Debtor's Post-Hr'g Br."), Doc. 526 ("Ellett's Post-Hr'g Br."), Doc. 527 ("Comm.'s Post-Hr'g Br.") & Doc. 528 ("S & W's Post-Hr'g Br."), respectively. S & W also filed a separate declaration in support of its brief. Doc. 529.
IV. Findings of Fact
A. The Distributor Agreement
S & W is one of the largest manufacturers of firearms and accessories in the United States, McPherson Decl. ¶ 4, and before liquidating its assets during its bankruptcy case, the Debtor was a national distributor of S & W-manufactured goods, Broering Decl. ¶ 5. Employing a two-step distribution system, S & W sells its products to distributors such as the Debtor, and the distributors resell the goods to dealers from which end consumers ultimately purchase them. The Debtor and S & W have entered into a series of distribution agreements over the years. McPherson Decl. ¶¶ 5-6. Their most recent contract, the Distributor Agreement, is comprised of the Smith & Wesson U.S. Distributor Agreement dated May 1, 2017 (Ex. 1) and the 1st Amendment dated September 29, 2017 (Ex. 2).[2] Id. ¶ 7.
Under the Distributor Agreement, S & W appointed the Debtor to act as a nonexclusive U.S. distributor of S & W's firearms and accessories (defined in the Distributor Agreement as the "Products"). Id. ¶ 8; Distrib. Agreement § 1.1. As of the Petition Date, the Distributor Agreement required the Debtor to "[u]se its best efforts to promote and sell the full range of Products" and to "[p]urchase and maintain a sufficient inventory of Products to effectively support product needs." Distrib. Agreement §§ 3.10, 3.13. And it obligated S & W, as the manufacturer, to "use commercially reasonable efforts to meet specified delivery dates and ship ordered Products to [the Debtor's] location as described in [the Debtor's] purchase order." Id. § 2.3.
The distributive purpose of the agreement was further served by the provisions relating to S & W's trade names and trademarks, which play a critical role in the distribution of the Products. Tr. at 131-32. S & W granted the Debtor a nonexclusive license to use its trade names and trademarks in connection with the sale of the Products. Distrib. Agreement § 12.0. For its part, the Debtor was obligated to not use S & W's trade names or trademarks (1) as a part of the Debtor's business name, (2) in connection with an effort to sell the goods of others, or (3) in a manner disapproved of by S & W. Id. Uses that would be "disapproved of by S & W" include "taking one of [S & W's] competitor's trademarks and putting it over the [S & W] trademark, changing the color, changing the shape, [and] changing ... the font." Tr. at 132.
The sale of firearms and accessories is highly regulated. Tr. at 59, 111, 128. For this reason, the Distributor Agreement spells out in great detail the Debtor's obligations *775 with respect to applicable laws. Section 3.0 required the Debtor, among other things, to:
3.1 Maintain all licenses required by[ ] all federal, state and local laws, statutes, ordinances and regulations and comply with all federal, state and local laws, statutes, ordinances and regulations relating to the sale and distribution of firearms and accessories during the term of this Agreement.
3.2 Employ sufficient adequately trained and competent personnel who will follow all federal, state and local laws, statutes, ordinances and regulations relating to the sale and distribution of firearms during the term of this Agreement.
3.3 Restrict the sale of firearms to those persons lawfully authorized to purchase or own firearms.
3.4 Not knowingly sell [the Products] to any person or entity who is not complying with the laws and regulations relating to the sale or distribution of firearms.
3.5 Maintain all required books and records relating to the sale or distribution of firearms and cooperate with all appropriate law enforcement inquiries relating to those books and records.
Distrib. Agreement §§ 3.1-3.5. In addition, § 6 of the Distributor Agreement requires the Debtor to "conduct its operations and the distribution and sale of the Products ethically and strictly in accordance with the letter and spirit of all applicable laws so that the name and reputation of [S & W] and its Products shall not be adversely affected." Id. § 6.0. The Debtor expressly acknowledged that "compliance with the provisions of [§ 6] is a material condition and term to this Agreement" and that "failure to comply with the provisions of this section affords [S & W] the right to terminate this Agreement without further obligation, right by the [Debtor] to cure or liability on the part of [S & W]." Id.
All of the obligations of the Debtor and S & W recited above are material, as discussed in more detail in the Court's legal analysis.[3] Given the materiality of the parties' obligations, the Debtor and S & W both have the right to terminate the Distributor Agreement for cause in the event of any breach of the agreement that goes uncorrected for 30 days after notice of such breach. Distrib. Agreement Ex. C (Terms and Conditions of Sale) § 8. The parties also have the right to terminate the agreement at any time without cause by giving 30 days' notice, id. § 17.2, and S & W has the right to terminate the agreement immediately upon the Debtor's failure to perform any term of the agreement, id. § 17.3.1.
With a term extending through April 30, 2019, the Distributor Agreement remained in effect until shortly before the Court issued this opinion. Id. § 17.0 & Sched. A. Between the Petition Date and the closing of the transactions contemplated by the APA, the Debtor sold the Products to dealers in the same manner it did before the Petition Date, including by using the trademarks that S & W permitted it to use under the terms of the Distributor Agreement. Tr. at 151-52.
B. Ellett's Distribution Agreement with S & W
Ellett and S & W are also parties to a Smith & Wesson U.S. Distributor Agreement *776 dated May 1, 2017 (Ex. E), as amended by the 1st Amendment to S & W Distributor Agreement dated September 29, 2017. Stips. ¶ 3. This agreement appointed Ellett and certain of its affiliates to act as a non-exclusive U.S. distributor of the Products. Ex. E § 1.1.
C. The S & W Free Goods Program
S & W would, from time to time, run incentive programs in order to increase the volume of firearms sold by its distributors. Stips. ¶ 11. Under these incentive programs, S & W offered free firearms and other goods ("Free Goods") with the purchase of a specified quantity of those goods. Stips. ¶¶ 10, 12. Just as distributors are conduits for purchased firearms, they also are conduits for the distribution of Free Goods to dealers. Tr. at 148-49.
Before the Petition Date, the Debtor participated in a program referred to as the 2017 Distributor Fall Program (the "Promotion"), which ran from July 17, 2017 through October 31, 2017. Stips. ¶ 17; see also Ex. S (copy of the flyer for the Promotion). Under the Promotion, if the Debtor had Free Goods in its inventory, it would provide them directly to the dealers; if the Debtor did not have them in stock, it would look to S & W to ship them to the Debtor, which in turn would forward the Free Goods to the dealers. Stips. ¶ 13. The Free Goods, along with other goods sold by S & W, were shipped through the Debtor to the dealers. Lacking a contractual relationship with the dealers, S & W had no legal obligation to dealers with respect to the Free Goods. In other words, S & W's only obligation with respect to the Free Goods was to the Debtor, and the dealers looked to the Debtor for any Free Goods that they were owed. Stips. ¶ 14. As a result, S & W and the Debtor engaged in substantial accounting efforts with respect to Free Goods, including both: (1) those the Debtor had already shipped to dealers from its inventory but had not yet received from S & W; and (2) those that were owed to dealers. Stips. ¶ 15. The Free Goods owed to each customer were subject to review by S & W to ensure that they were properly earned under the Promotion. Stips. ¶ 16.
The Debtor contends that, as of the Petition Date, it had not received replacement goods for the $ 846,165 worth of Free Goods it shipped to retailers prepetition from its own inventory. Sweigart Decl. ¶ 6. The Debtor also asserts that, as of the Petition Date, it owed $ 669,491 of Free Goods to dealers that it did not have in its inventory and that it had not received from S & W despite requesting shipment. As a result, the Debtor contends that S & W owed it a total of $ 1,515,656 as of the Petition Date. Id.
D. S & W's Failure to Ship to the Debtor
S & W refused to ship Products to the Debtor on several occasions before the Petition Date. Broering Decl. ¶ 9; Tr. at 122-25. According to S & W, it failed to make shipments only if: (1) the Debtor had exceeded its credit limit with S & W; (2) the Debtor had defaulted in making payments to S & W;[4] or (3) the Debtor had otherwise violated the Distributor Agreement. Tr. at 122-25; see also Tr. at 154 (Mr. Broering testifying that "[w]hen they refused [to ship], they would tell us" and "[t]ypically it was for credit reasons, either credit limitations or us being past due with them").
E. The Asset Sale
The Debtor engaged Huron several months before the Petition Date to provide *777 investment banking services and to market the Debtor's assets for sale. Frankel Decl. ¶ 5. As part of the marketing process, the Debtor made a substantial amount of information available to potential buyers in a data room, which the Debtor updated in response to specific requests for information. Id. ¶ 8. Neither the Distributor Agreement nor the Debtor's distributor agreements with its other suppliers were ever included in the data room. Id. ¶ 9. This was so for two reasons: (1) the Debtor did not believe distributor agreements were executory contracts that could be assumed and assigned; and (2) several of the potential buyers already had their own distributor agreements with many of the same suppliers that provided goods to the Debtor and accordingly had not expressed any interest in the Debtor's distributor agreements. Id. Ellett, which was a party to its own distributor agreement with S & W, was aware that it was "common practice in the gun industry to operate under distributor agreements," Johnson Decl. ¶ 14; Tr. at 95, and other information in the data room would have made clear that S & W was a supplier of the Debtor, Tr. at 37. Ellett accordingly would have had every reason to believe that the Debtor was a party to a distributor agreement with S & W. But although documents were included in the data room at Ellett's request, Tr. at 36-37, Ellett never requested a copy of the Distributor Agreement or any of the Debtor's other distributor agreements during the 30 to 60 days in which Ellett had to conduct due diligence before the Petition Date, Frankel Decl. ¶ 14; Tr. at 37, 77.
In early 2018, the Debtor and Ellett began negotiating the terms of an agreement under which Ellett would purchase certain of the Debtor's assets, culminating in their entry into the APA on April 30, 2018, the day before the Petition Date. Stips. ¶¶ 20-23. The APA provides for the sale of certain of the Debtor's assets to Ellett, excluding, among other assets, the "RTG Assets"[5] and accounts receivable. Stips. ¶ 24. Ellett entered into the APA for the primary purpose of purchasing the Debtor's real estate and information technology assets, including related contracts and leases. Tr. at 47-48, 64-65. The APA (Ex. 6) defines "Assigned Contracts" to mean:
the Contracts listed in Section 2.5 of the Disclosure Schedules to be assumed by Seller and assigned to Buyer under Section 365 of the Bankruptcy Code, as such schedule may be amended from time to time prior to the Closing pursuant to Section 2.5; provided, however, that notwithstanding anything else herein, Contracts related exclusively to RTG Assets shall not be Assigned Contracts.
APA at 2. Section 2.5(a) of the APA, which governs the assumption and assignment of Assigned Contracts, states:
Prior to [April 30, 2018, the date the parties entered into the APA], Buyer shall designate each of the Assigned Contracts, if any, that Buyer elects to have assumed and assigned to it as an Assigned Contract effective as of the Closing Date, with all such Assigned Contracts to be set forth on Section 2.5 of the Disclosure Schedules. Buyer shall have the right, until the second business day prior to the Closing Date, to either (i) designate any Contract not already so designated to be an Assigned Contract or (ii) remove any Contract from Section 2.5 of the Disclosure Schedules. Section 2.5 of the Disclosure Schedules shall be *778 amended to include or remove any such Contract as an Assigned Contract.
APA § 2.5(a). The APA provides for the sale of the "Purchased Assets," including "all Assigned Contracts set forth on Section 2.5 of the Disclosure Schedules," APA § 2.1(b), while "Contracts that are not Assigned Contracts " are "Excluded Assets," APA § 2.2(c). Section 2.5 of the Disclosure Schedules to the APA does not include the Distributor Agreement. Ex. 7.
On the Petition Date, the Debtor filed a motion identifying Ellett as the stalking horse bidder for certain of its assets on the terms set forth in the APA. Doc. 19. The Debtor requested in the motion that the Court approve a timetable for the submission of competing bids, the designation of executory contracts and unexpired leases for assumption and assignment in connection with the sale, and the completion of an auction and a sale hearing. The Committee objected and, after holding an expedited hearing, the Court entered an order that would allow for a sale to occur quickly, while accommodating the Committee's request for potential bidders to have more time to submit competing bids. Doc. 109. The order also provided a deadline for the Debtor to file and serve a notice of proposed cure amounts on each non-Debtor party to an executory contract or unexpired lease to be assumed and assigned in connection with the sale. Id. at 7-8. In accordance with the order, the Debtor filed a notice stating that it intended to assume and assign the executory contracts set forth on the exhibit to the notice. Ex. 12 & Doc. 132. The exhibit did not include the Distributor Agreement or any other agreements with firearms manufacturers, but the notice stated that the Debtor could modify the list of contracts to be assumed and assigned in connection with the sale. Id. at 2 n.2; Stips. ¶ 28.
After submitting the notice, the Debtor filed a motion seeking approval of the sale to Ellett or, if the Debtor received a qualified competing bid, to the successful bidder. Doc. 140. Even though S & W contends that it had determined early on that effectuating the delivery of Free Goods to the dealers "would be best achieved by an assumption and assignment of the Distributor Agreement to another qualified distributor," McPherson Decl. ¶¶ 20, 25, S & W did not raise this issue when it responded to the sale motion in mid-June 2018. Instead, S & W reserved its right "to object to any Cure Amounts, adequate assurance of future performance, or other issues raised in connection with the S & W Distributor Agreement in the event of any 'last minute' effort to assume and assign the S & W Distributor Agreement to Ellet[t] or any other buyer." Ex. 8 & Doc. 184 at 6 (emphasis added). This statement strongly suggested that S & W would be less than enthusiastic about efforts that could result in the assignment of the Distributor Agreement. At that time, however, S & W was the only party engaging in "last minute" efforts to have the Distributor Agreement assigned to Ellett.
No qualified competing bids were received, and the auction was cancelled. But an issue arose under the APA relating to certain software and equipment housed at Connectria, LLC (collectively, the "Connectria IT Assets"), which were some of the primary assets that Ellett wished to purchase. Johnson Decl. ¶ 10. Ellett said it believed the Debtor to be the owner of the Connectria IT Assets, but the Debtor did not in fact own those assets. Id. During a status conference, the Debtor and Ellett indicated that they intended to resolve their dispute over the Connectria IT Assets by amending the APA and entering into a "transition services agreement," which they described as involving only nonmaterial changes to the transaction. The Court directed the Debtor to submit *779 the amended deal documents along with a statement as to why it believed the changes to be nonmaterial. This filing showed that (1) the purchase price was being reduced by $ 500,000 due to Ellett's need to acquire new computer equipment and (2) the Debtor was giving Ellett additional concessions valued at approximately $ 250,000. Doc. 207. The Committee objected on the grounds that a $ 750,000 net reduction in sale proceeds would materially alter unsecured creditors' anticipated recoveries. Doc. 210 at 4. The Court then entered an agreed order extending the original bid deadline by two weeks and requiring the Debtor to file and serve an amended sale motion. Doc. 219. As the Court directed, the Debtor filed a motion for approval of the Debtor's entry into the amendment to the APA and the transition services agreement. Doc. 220. Notwithstanding the two-week extension of the original bid deadline, no additional bids for the Debtor's assets were received.
A sale hearing was scheduled for June 27, 2018, and the Debtor and Ellett committed that, if the Court approved the sale motion, the sale would close no later than June 29, 2018. Doc. 218. Ellett wanted the closing to occur by the end of the month in order to avoid a temporary loss of benefits for more than 100 employees of the Debtor who were coming on board with Ellett. Tr. at 41-42, 79; Johnson Decl. ¶ 13 ("[I]t was imperative that the sale close by the end of the month of June, because that was the only way that Ellett could provide benefits for transferred employees for the following month. Ellett was concerned that transferred employees would not accept employment with Ellett if there was going to be a gap in those employees' insurance coverage.").
F. Ellett's Hesitation to Designate the Distributor Agreement
S & W had made its desire for the Distributor Agreement to be assumed and assigned known to Ellett by early to mid-June 2018. See Johnson Decl. ¶ 15 (stating that Ms. McPherson contacted the parent of Ellett about the assumption and assignment of the Distributor Agreement on or about June 6, 2018); McPherson Decl. ¶ 25 (stating that Ms. McPherson connected with the CEO of Ellett's parent company regarding the assumption and assignment on or around June 14, 2018). S & W, however, was insisting that the assumption and assignment be "conditioned upon S & W delivering additional inventory to Ellett," McPherson Decl. ¶¶ 25-26; Johnson Decl. ¶ 23, and Ellett was unwilling to agree to those terms because the amount of inventory that S & W was asking it to purchase "would have pushed [Ellett] at or above [its] credit line," Tr. at 87; id. at 48-49. Thus, the day before the sale hearing, Mr. Johnson, on behalf of Ellett, sent an email to Jim McCrudden, the CFO of Ellett's parent United Sporting Companies, advising him: "I think we should not NOT pick up the Acu[S]port agreement. This should be arms length as New to us. I don't trust them not to stick it to us with only [their] liabilities. We should merely be a conduit to service the free goods that were already earned." Ex. J.
Having heard that Ellett did not intend to pursue the assumption and assignment of the Distributor Agreement, Ms. McPherson sent an email to Mr. McCrudden and Mr. Johnson in which she stated:
Through our attorneys we have been informed that you will not assume the agreement in bankruptcy and expect us to work something out post close. Please be aware that this will not work for Smith & Wesson. If the agreement is not assumed in bankruptcy, we will have to deal with numerous other issues and will take a different approach. We need to discuss this as soon as possible.
*780 Ex. U. Despite this, Mr. Johnson advised Ms. McPherson immediately before the Sale Hearing began that Ellett "was still not prepared to designate the Distributor Agreement at that time." McPherson Decl. ¶ 28. At this point, Ellett had already had between 90 and 120 days to conduct due diligence. Tr. at 76-78.
The Debtor and the Committee were not involved in the discussions between Ellett and S & W about the Distributor Agreement. Tr. at 86. A day or two prior to the sale hearing, however, Mr. Frankel, on behalf of the Debtor, contacted Ellett's investment banker to inquire whether Ellett intended to designate the Distributor Agreement for assumption and assignment. Id. at 32-33. Mr. Frankel never heard back in response to his inquiry. Id. Then, on the morning of the sale hearing, "the Committee and [the Debtor] asked [Mr. Johnson] what additional contracts Ellett intended to designate for assumption and assignment and whether Ellett intended to designate the Distributor Agreement." Johnson Decl. ¶ 21. According to Mr. Johnson, he "responded that Ellett would be designating additional contracts and while [he] did not believe that Ellett would be taking assignment of the Distributor Agreement, [he] could not make a decision until [he] had further discussions with S & W." Id. The Debtor and the Committee believe that Mr. Johnson had more definitively expressed Ellett's intent not to designate the Distributor Agreement. Frankel Decl. ¶ 17 (representing that Mr. Johnson advised Mr. Frankel "that Ellett did not intend" to designate the Distributor Agreement for assumption and assignment); Tr. at 36. Furthermore, taking into consideration the type of assets that Ellett was purchasing and the related contracts that it was designating for assumption and assignment, the Debtor and its professionals did not view the Distributor Agreement as a type of contract that Ellett would be interested in designating. Tr. at 172-73.
G. The Sale Hearing
The parties announced at the start of the sale hearing that they had reached a resolution of the objections to the sale. Ex. 9 (transcript of sale hearing) at 9-13. The resolution of the Committee's objections included a purchase price reduction of $ 400,000 rather than $ 500,000, fee reductions by all of the bankruptcy estate's professionals, a reduction in payments under the Debtor's Key Employee Retention Program, and a potential waiver of fees by Wells Fargo Bank, N.A., as agent for the Debtor's senior secured lenders holding a blanket lien on the Debtor's assets. See Doc. 229 (stipulation and agreed order resolving the Committee's objection to the sale).
As stated above, the Court had previously entered a stipulation and agreed order providing that the sale, if approved, would close no later than June 29, 2018. Doc. 218. During the sale hearing, counsel for Ellett confirmed the parties' intention to close by that date and agreed to provide for a June 29, 2018 closing date (the "Closing Date") in the Sale Order. Ex. 9 at 13-14. Under the APA, the deadline for Ellett to designate additional contracts for assumption and assignment was "the second business day prior to the Closing Date." APA § 2.5(a). Because it had been announced in open court that the Sale Order would define June 29, 2018 as the "Closing Date," S & W would have known that the deadline for Ellett to designate the Distributor Agreement for assumption and assignment was the date of the sale hearing, June 27, 2018 ("the second business day prior to the Closing Date"). Id. Despite this, S & W's counsel gave no indication during the sale hearing that S & W was pressing for the Distributor Agreement to be assigned to *781 Ellett. To the contrary, its attorney stated that S & W's objection to the sale was being resolved without any assumption and assignment of the Distributor Agreement:
Smith & Wesson is party to an executory contract, a distribution agreement with the Debtors. My understanding from counsel to Ellett is that that contract is not being assumed and it is not included on the additional contracts this morning . The rest of my comments are based on that understanding. We reserve our rights if we're added to the assumption schedule between now and the upload of the order.
We had requested in our objection that the asset purchase agreement be clarified to make it clear that our-the alleged accounts receivable owed by Smith & Wesson to the Debtor were not being included in the sale assets. That was included in the revised asset purchase agreement. Counsel also agreed to insert into the order in the version that was uploaded yesterday, at the end of Paragraph 8, a statement that says: "For the avoidance of doubt, the purchased assets shall not include Debtor's accounts receivable and entry of this order shall in no way impact any parties' rights with respect thereto." And so long as our contract is not being assumed and that language is included in the sale order, our objection is resolved .
Ex. 9 at 16-17 (emphasis added).
Based on this and other representations made during the sale hearing, the Court advised the parties that it would approve the sale after the parties submitted a revised version of the order. Ex. 9 at 18.
H. The Sale Order
On June 28, 2018, the parties submitted and the Court entered the Sale Order, which included as exhibits lists of the contracts to be assumed by the Debtor and assigned to Ellett under § 2.5(a) of the APA. The Distributor Agreement did not appear on those lists. Instead, the parties included in the Sale Order a separate provision governing the treatment of the Distributor Agreement. Tr. at 46-47. This provision, which is contained in Paragraph 19 of the Sale Order, states as follows:
Notwithstanding Section 2.5(a) of the APA, [Ellett] shall have until 5:00 p.m. Eastern Time on July 5, 2018 (the "S & W Designation Deadline" ) to designate [the Distributor Agreement] as an Assigned Contract that shall be assumed and assigned, pursuant to paragraph 18 hereof, subject to the right of any party-in-interest to object to the [Notice of Designation] for any reason, including, but not limited to, challenging whether the [Distributor Agreement] is a contract that can be assumed and assigned under section 365 of the Bankruptcy Code. Such designation shall be evidenced by the filing of a notice with the Court (and served on all parties listed in Section H hereof) by [Ellett] by the S & W Designation Deadline (the "[Notice of Designation]" ). Any party in interest, including, but not limited to the Debtor and the Committee, shall have until 5:00 p.m. Eastern Time on July 16, 2018 to file any opposition to the [Notice of Designation], upon which the Court may enter an order setting a hearing and briefing schedule related to such dispute. In the event that no such opposition is filed by 5:00 p.m. Eastern Time on July 16, 2018, then the [Distributor Agreement], subject to all rights, claims and defenses, including recoupment and setoff, shall be deemed assigned to [Ellett] as an Assigned Contract.
Sale Order ¶ 19. Paragraph 18 of the Sale Order, to which ¶ 19 refers, provides in pertinent part as follows:
*782 Debtor is authorized and directed to assume and sell and assign the Assigned Contracts to [Ellett] free and clear of all Encumbrances, except for [Ellett's] obligation to pay certain applicable Cure Amounts in excess of the Cure Amount Cap, if any, and the obligations expressly provided for in paragraph 24 of this Order. ... As of the Closing Date, [Ellett] shall be deemed to have acquired and assumed the Assigned Contracts pursuant to sections 363 and 365(f) of the Bankruptcy Code. The assignment by Debtor of such Assigned Contracts shall not be a default thereunder and [Ellett] is entitled to the protections afforded under section 363(m) of the Bankruptcy Code with respect thereto.
Id. ¶ 18.
Following the sale hearing, Ellett finalized its schedule of Assigned Contracts to include the 14 additional contracts that are listed on Exhibit C to the Sale Order. See id. ¶ 23 ("Notwithstanding anything in the APA to the contrary, [Ellett] may add or remove executory contracts and unexpired leases from the list of Assigned Contracts at any time until two (2) business days prior to the Closing Date. Pursuant to this provision, [Ellett] has requested that the executory contracts set forth on Exhibit C hereto be assumed and assigned to it in connection with the Sale."). Exhibit C did not include the Distributor Agreement or distributor agreements that the Debtor had with other manufacturers.
Several findings and decretal paragraphs of the Sale Order apply to "Assigned Contracts" and "Purchased Assets" (a term that includes Assigned Contracts). The Sale Order includes findings that: (1) the APA "constitutes the highest or otherwise best offer for the Purchased Assets"; (2) the APA "represents a fair and reasonable offer to purchase the Purchased Assets, including the Assigned Contracts, under the circumstances of this Case"; (3) the Debtor's sale motion and the APA are in the best interests of the Debtor and its estate; and (4) "[t]he sale and assumption and assignment of the Assigned Contracts pursuant to the terms of [the Sale Order] is integral to the APA, is in the best interests of Debtor and its estate, creditors and other parties in interest and represents the reasonable exercise of sound and prudent business judgment by Debtor." Id. ¶¶ U, V, W, EE. The Sale Order also provides that the "Debtor is authorized and directed to assume and sell and assign the Assigned Contracts to [Ellett]" and that, in light of Ellett's good faith and the lack of collusion, the reversal or modification of the Sale Order on appeal "shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts)." Id. ¶¶ 18, 32. These and other provisions of the Sale Order that apply to Assigned Contracts and Purchased Assets do not apply to the Distributor Agreement. Although the Sale Order provides that the Distributor Agreement "shall be deemed assigned" to Ellett as an Assigned Contract "[i]n the event that no ... opposition is [timely] filed," id. ¶ 19, objections were filed, and the Court is sustaining them. As a result, the Distributor Agreement is neither an Assigned Contract nor a Purchased Asset under the Sale Order.
I. The Closing
As previously stated, Ellett had entered into the APA for the primary purpose of purchasing the Debtor's information technology assets and the real estate where the Debtor's warehouse/distribution center was located. Tr. at 47-48, 64-65. The contracts that Ellett included on Section 2.5 of the Disclosure Schedules at the time the Sale Order was entered primarily related to such assets, and none of those contracts were distributor agreements or other *783 agreements with gun manufacturers. Tr. at 67-75; Sale Order at 124-29. Thus, as Mr. Johnson conceded, Ellett likely would have closed even if ¶ 19 had not been included in the Sale Order. Tr. at 47-48. Consistent with Mr. Johnson's concession, Ellett neither sought to delay the closing nor requested a holdback from the purchase price even though there was uncertainty regarding whether the Distributor Agreement could be assumed and assigned. Id. at 80-81. Despite that uncertainty, the sale closed on June 29, 2018. Ex. 10; Stips. ¶ 31.
J. Ellett's and S & W's Agreement to Designate the Distributor Agreement
After the sale hearing, S & W and Ellett agreed, in the event that the Court approved the assumption and assignment of the Distributor Agreement, to enter into a Second Amendment to the agreement (the "Second Amendment"). Stips. ¶¶ 7-8; McPherson Decl. ¶ 33; Ex. 3 (copy of the Second Amendment). Under the Second Amendment, S & W would provide goods to Ellett having a value of $ 834,988.20. Stips. ¶ 9; Second Amendment ¶ 3(i). Of this amount, Ellett would agree to deliver goods to former customers of the Debtor that had previously earned Free Goods with a value of $ 679,227, Stips. ¶ 9; Second Amendment ¶ 3(ii), an amount that is approximately equal to the value of Free Goods ($ 669,491) that the Debtor asserts it owed to dealers as of the Petition Date because S & W never shipped them to the Debtor, Sweigart Decl. ¶ 6. The difference between the value of the goods that S & W would provide to Ellett and the value of those that Ellett would be required to distribute to dealers-nearly $ 156,000-was intended to compensate Ellett for the costs associated with distributing Free Goods to the Debtor's dealers. McPherson Decl. ¶ 34; Johnson Decl. ¶ 26; Tr. at 101. S & W and Ellett agreed that the Distributor Agreement would terminate automatically once Ellett made the required distributions to dealers. Tr. at 103; Second Amendment ¶ 4. Ellett, however, would continue to operate under its own distributor agreement with S & W just as it did before the sale. Johnson Decl. ¶ 30.
K. The Notice of Designation
Having agreed to enter into the Second Amendment, Ellett also agreed to designate the Distributor Agreement for assumption and assignment. Thus, it filed the Notice of Designation, which states:
PLEASE TAKE NOTICE that, pursuant to paragraph 19 of the [Sale Order], and section 2.5 of the [APA], Ellett hereby designates [the Distributor Agreement], including all rights and entitlements under all prepetition promotional programs for "free products"[ ] and all other rights and entitlements thereunder, as an Assigned Contract consistent with the terms of the APA and Sale Order (including paragraph 18 thereof). Ellett hereby reserves its right at anytime prior to the approval by the Court of the assumption and assignment of the [Distributor Agreement] to withdraw this designation within Ellett's sole discretion with the effect that it will be as if this designation was never filed.
PLEASE TAKE FURTHER NOTICE that all Cure Amounts applicable to the [Distributor Agreement], including $ 778,227.08 that S & W asserts is currently owed by AcuSport to S & W thereunder, shall be resolved and satisfied by and under [the Second Amendment], which shall become effective upon the assumption and assignment of the [Distributor Agreement] to Ellett as provided herein.
Ex. 13 & Doc. 240 (footnote omitted). Exercising their right to object for any reason, *784 the Debtor and the Committee filed objections to the Notice of Designation.
L. The Indemnification Agreement
Ellett requested that S & W indemnify it for the costs associated with the Notice of Designation, and S & W agreed to do so. Tr. at 49-50. S & W and Ellett thus entered into an indemnification agreement (Ex. AA) providing that S & W would indemnify Ellett for all out-of-pocket expenses, including attorneys' fees, incurred in connection with the litigation concerning the Notice of Designation. Stips. ¶¶ 37-38.
M. The Preference Claim
The Debtor made payments of approximately $ 4.2 million to S & W within the 90-day period before the Petition Date, a fact acknowledged by Ms. McPherson. Tr. at 143. The Debtor alleges that these payments-four transfers totaling $ 4,219,460.08-constitute avoidable preferential transfers. Sweigart Decl. ¶ 7. After conducting its analysis of the Preference Claim by sometime in May 2018, Tr. at 167-68, the Debtor commenced an adversary proceeding against S & W (Adv. No. 18-2067) to recover the alleged preferential transfers (the "Preference Claim"). S & W has not yet filed an answer in the adversary proceeding, which is being held in abeyance pending the Court's determination of the issues that are the subject of this opinion. But S & W has provided the Debtor with a position letter detailing the defenses that S & W would assert to the Preference Claim, Stips. ¶ 35, including the ordinary course of business defense of § 547(c)(2) of the Bankruptcy Code and the new value defense of § 547(c)(4), Tr. at 142-43. The Debtor disputes S & W's asserted defenses. Stips. ¶ 36.
Ms. McPherson represented in her declaration that "[a]ny impact that assumption and assignment of the Distributor Agreement may have on any potential avoidance action against S & W is not, and has not been, a factor in S & W's efforts to have the Distributor Agreement assigned to Ellett." McPherson Decl. ¶ 21. Instead, she emphasized in her declaration the importance of the delivery of the Free Goods, stating that if they "are not delivered, S & W's brand and reputation would be harmed with [the] dealers and in the industry as a whole" and "[t]hus, it is imperative to S & W that it is able to make good on its Promotion and ensure that the Free Goods are delivered." Id. ¶ 22. Her testimony during the hearing on the Notice of Designation, however, was more equivocal:
Q. So you did at least though consider the preference when you were deciding whether to ask Ellett to assume and assign the agreement; isn't that correct?
A. Did we consider it? It's-it's a benefit for certain, except that if I didn't ask to have this assigned, I would probably spend just as much in attorneys' fees defending preference. So one way or another I don't believe I have a preference claim .... [I]f Ellett takes this contract, then I can get [the Debtor's former customers] their firearms. That's my primary motivation for Ellett taking the contract.
Tr. at 136-37.
The attorneys' fees Ms. McPherson referenced are not only S & W's, but also those for which S & W agreed to indemnify Ellett. It is clear based on this testimony alone that the Preference Claim is a factor in S & W's efforts to have the Distributor Agreement assumed by the Debtor and assigned to Ellett. In fact, evidence of S & W's failure both before and after the Petition Date to ensure that the Free Goods were delivered to dealers in a timely fashion demonstrates that the Free-Goods explanation is pretextual and that the Preference Claim is the primary *785 factor motivating S & W. The former customers of the Debtor that were owed Free Goods as of the Petition Date had been owed those goods for some time-anywhere from the beginning of the Promotion on July 17, 2017 to the time the Promotion ended on October 31, 2017. That is, the Promotion ended a full six months before the Petition Date, yet as of that time approximately $ 680,000 of Free Goods had not made it into the hands of the dealers. Tr. at 137-38. Ms. McPherson explained that the "process generally takes a substantial amount of time in the normal course of business" because of the need to submit purchase orders and validate purchases. Id. at 138-39. This explanation, however, did not adequately explain why the process could not have been completed, at least with respect to some of the dealers who were owed Free Goods, in the six to nine months that S & W had before the Petition Date.
Ms. McPherson's explanations as to why S & W did not distribute these Free Goods through the Debtor or did not ask Ellett to distribute them without an assumption and assignment of the Distributor Agreement after the Petition Date were equally unconvincing. According to Ms. McPherson, in order to ship Free Goods through the Debtor, S & W "would have had to ask [the Debtor] whether [it] had an FFL," a federal firearms license. Id. at 139. But asking the Debtor whether it retained its federal firearms license should have been no impediment. The Debtor still had a federal firearms license as of the date of the hearing on the Notice of Designation, id. at 155, and S & W should have had no difficulty determining that this was the case at any time after the Petition Date.
Ms. McPherson also testified that she believed that the Committee would have objected to any attempt to distribute Free Goods to the Debtor's former customers rather than liquidating the goods and distributing their value to all creditors. Id. at 139-40. But S & W has also taken the position that any Free Goods that have not yet been shipped belong to the Debtor's former customers, not the bankruptcy estate, citing in support an email from the CFO of the Debtor in which he advised Ms. McPherson that "unless [the Debtor has] already shipped the [F]ree [G]oods to retailers, [F]ree [G]oods are owed to retailers and not [the Debtor]." S & W's Post-Hr'g Br. at 42-43 n.94. In view of S & W's stance on this issue, Ms. McPherson would have had no reason to be concerned about an objection by the Committee to the distribution of Free Goods through the Debtor. Likewise, Ms. McPherson's testimony that she did not ask Ellett to ship Free Goods without an assumption and assignment because "that wouldn't get rid of my obligation to [the Debtor]" is inconsistent with S & W's view that the Free Goods did not belong to the Debtor. Tr. at 145. Given all this, Ms. McPherson's testimony that the Preference Claim had nothing to do with S & W's efforts to have the Distributor Agreement assumed by the Debtor and assigned to Ellett is simply not credible.
N. The Effect of Assumption and Assignment on the Bankruptcy Estate
Any recovery on the Preference Claim-even one reduced by virtue of the ordinary course and new value defenses asserted by S & W and the fees and costs incurred in obtaining the recovery-would benefit the bankruptcy estate by increasing the distributions to creditors. Although the amount of recovery the estate will realize on the Preference Claim is uncertain, the ability to make a claim itself has value. Thus, taking the Preference Claim away from the estate by affording S & W a complete defense through the assumption and assignment of the Distributor Agreement *786 would significantly harm the Debtor's bankruptcy estate. Sweigart Decl. ¶ 8; Tr. at 179. Mr. Sweigart accordingly testified credibly on behalf of the Debtor that the "preference issue"-i.e., the elimination of the Preference Claim-was "front and center on why [the] Debtor had an issue with" the designation of the Distributor Agreement for assumption and assignment when the issue arose shortly before the sale hearing. Tr. at 172.
By contrast, the benefits to the estate of assuming and assigning the Distributor Agreement are minimal or non-existent. Although the assumption and assignment might eliminate any liability the Debtor would otherwise have to dealers for the Free Goods that have not been delivered, the Debtor's estate almost certainly will never pay claims related to the Free Goods in any event. Ms. McPherson explained that distributing the Free Goods is important to S & W's business interests, and the evidence shows that S & W would be able to accomplish that goal through Ellett without the assumption and assignment of the Distributor Agreement. S & W therefore likely will ship the Free Goods to the dealers without the assumption and assignment, making it unnecessary for the dealers to look to the bankruptcy estate for the Free Goods or their value. And even if the dealers were to make claims against the estate for the Free Goods, the assumption and assignment of the Distributor Agreement still would not benefit the Debtor's bankruptcy estate. Any claims for the Free Goods that the bankruptcy estate actually becomes liable for would constitute prepetition claims that the estate would be required to pay pro rata with other unsecured claims at cents on the dollar. Thus, the possible extinguishment of the Debtor's liability for those claims does not justify the Debtor's assuming and assigning the Distributor Agreement and thereby eliminating any chance the bankruptcy estate would have to recover on the Preference Claim.
V. Legal Analysis
A. The Executory Nature of the Distributor Agreement
Under the Bankruptcy Code, a contract may not be assigned unless it is assumed, 11 U.S.C. § 365(f)(2)(A), and a debtor in possession, "subject to the court's approval, may assume or reject any executory contract." 11 U.S.C. § 365(a). S & W and Ellett argue that the Distributor Agreement is an executory contract while the Debtor and the Committee take the contrary view.
Before discussing the meaning of the term "executory contract" and analyzing the Distributor Agreement to determine whether it is indeed executory, the Court pauses to note that it generally is "well established that ... distributor arrangements are executory contracts within the scope of Section 365 of the Code." In re Dartmouth Audio, Inc. , 42 B.R. 871, 876 (Bankr. D.N.H. 1984). And that makes sense, because a debtor's ability to make distributions to creditors sometimes depends on the executory nature and concomitant assignability of a distributor agreement. For example, in the Chapter 11 case of a distributor for manufacturer Mack Trucks, Inc., the debtor lacked sufficient capital to continue operating its business and therefore sought to generate value for its creditors by assuming its distributor agreement and assigning it to an entity that lacked its own distributor agreement with Mack Trucks. Although the manufacturer conceded that the distributor agreement was executory, it opposed the assignment based on lack of adequate assurance of future performance by the assignee. The bankruptcy court overruled the objection and approved the debtor's request to assume and assign the *787 admittedly executory distributor agreement. In re Bronx-Westchester Mack Corp. , 20 B.R. 139, 143 (Bankr. S.D.N.Y. 1982).
Here the roles are reversed, with the manufacturer, S & W, supporting the assumption and assignment of the Distributor Agreement and the Debtor opposing it. Not only that, but the Debtor goes so far as to contend that the Distributor Agreement is not executory. This role-reversal, however, does not alter the analysis the Court must conduct to determine whether the Distributor Agreement is executory.
What, then, makes a contract "executory"? To fill the gap left by the Bankruptcy Code, which does not define the term, the Sixth Circuit has used both the "Countryman definition" and the "functional test."[6] Each will be addressed in turn.
1. The Countryman Definition
As the Supreme Court has noted, "the legislative history to § 365(a) indicates that Congress intended the term [executory contract] to mean a contract 'on which performance is due to some extent on both sides.' " N.L.R.B. v. Bildisco & Bildisco , 465 U.S. 513, 522 n.6, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (quoting H.R. Rep. No. 95-595, at 347 (1977)). This legislative history has been identified as the source for the "some performance due" test of executoriness. See, e.g. , In re Helm , 335 B.R. 528, 535 n.11 (Bankr. S.D.N.Y. 2006). Modifying this test, many courts have adopted a definition formulated by Professor Vern Countryman under which the mutual unperformed obligations contemplated by the legislative history render a contract executory only if those obligations are material. In particular, a contract is executory under the Countryman definition if "the obligation[s] of both the [debtor] and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Vern Countryman, Executory Contracts in Bankruptcy: Part I , 57 Minn. L. Rev. 439, 460 (1973).
According to the Sixth Circuit, the legislative history cited above suggests that Congress "had in mind the definition of executory contracts set forth in Countryman." Terrell v. Albaugh (In re Terrell) , 892 F.2d 469, 471 n.2 (6th Cir. 1989). In Terrell , the Sixth Circuit concluded that the contract under consideration was "executory within the meaning of section 365, since under state law both parties have substantial obligations left to perform." Id. at 473 ; see also O'Brien v. Ravenswood Apartments, Ltd. (In re Ravenswood Apartments, Ltd.) , 338 B.R. 307, 311 (6th Cir. BAP 2006) ("After citing the definition set forth in the legislative history, the Terrell court adopted the so-called Countryman definition of an executory contract.").
Under the Countryman definition, the issue of whether the failure to complete performance would constitute a material breach is determined by the law governing the contract, see Terrell , 892 F.2d at 471 -here the law of Massachusetts, Distrib. Agreement ¶ 23.1. The relevant date for determining whether there *788 are material unperformed obligations under the contract and applicable law is the date the bankruptcy case was filed. See, e.g. , COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.) , 524 F.3d 373, 381 (2d Cir. 2008) ; Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.) , 476 F.3d 665, 669 n.4 (9th Cir. 2007) ; Gen. DataComm Indus., Inc. v. Arcara (In re Gen. DataComm Indus., Inc.) , 407 F.3d 616, 623 (3d Cir. 2005) ; Carlson v. Farmers Home Admin. (In re Newcomb) , 744 F.2d 621, 624 (8th Cir. 1984).[7] For the reasons explained below, the Court concludes that the Debtor and S & W both had material unperformed obligations under the Distributor Agreement as of the Petition Date and that the agreement accordingly is executory under the Countryman definition.
a. Material Unperformed Obligations with Respect to the Products
i. Unperformed Obligations as of the Petition Date
The purpose of the Distributor Agreement is to establish the terms and conditions under which the Debtor would act as a distributor of the Products. Distrib. Agreement § 1.1. Consistent with this purpose, the Debtor was obligated to "[u]se its best efforts to promote and sell the full range of Products," id. § 3.10, while S & W was required to use commercially reasonable efforts to ship Products in accordance with the Debtor's purchase orders, id. § 2.3. Thus, the Debtor and S & W both had unperformed obligations on the Petition Date with respect to the Products. Moreover, neither of these obligations was meaningless, nor was this the kind of agreement under which the parties had no real duty to one another.[8]
Although the Distributor Agreement leaves the phrase "best efforts" undefined, it is "not required that all terms ... be precisely defined[,]" and "an undefined or unspecified term ( [for] example, 'best efforts' ...) does not necessarily preclude formation of a binding contract." Vincent v. Vincent , No. 06-P-569, 2007 WL 1732248, at *2 (Mass. App. Ct. 2007). This stands to reason because, even if there is *789 "room to argue about what efforts should have been taken, it is abundantly clear that [the] 'best efforts' [clause] required [the Debtor] to make at least some effort." Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.) , 212 B.R. 10, 17 (D. Mass. 1997), aff'd , 186 F.3d 1356 (Fed. Cir. 1999) ; cf. Randall v. Peerless Motor Car Co. , 212 Mass. 352, 99 N.E. 221, 226 (1912) (defining a "best energies" clause to require a sales agent to undertake "such effort as in the exercise of sound judgment would be likely to produce the most profitable results to the [manufacturer] in view of the nature of the business and the extent of territory over which it was to be conducted").
According to the Committee, the Distributor Agreement was not an executory contract as of the Petition Date because, at that time, the Debtor had no remaining contractual obligation to use its best efforts to promote and sell the Products. The Committee bases its argument on the following undisputed facts: (1) "the Debtor is no longer operating, has liquidated all of its S & W inventory, had stated its intention to liquidate its businesses and assets on the Petition Date ... and has not purchased and received S & W inventory since prior to the Petition Date"; and (2) "S & W affirmatively stopped accepting orders prior to the Petition Date." Comm.'s Post-Hr'g Br. at 16. But those facts show only that the parties were not performing under the Distributor Agreement. They do not establish that the Debtor was no longer obligated to use its best efforts to promote and sell the Products as of the Petition Date.
The decision on which the Debtor relies in arguing against executoriness does not support its position. See Debtor's Pre-Hr'g Br. at 16 n.64 (citing KM Grp., Inc. v. Cincinnati Gas & Elec. Co. (In re KM Grp., Inc.) , 129 B.R. 152, 155 (Bankr. S.D. Ohio 1991) ). In KM Group , the debtor, a real estate developer, entered into a prepetition agreement with a utility company to share the costs of extending a gas main into a housing project being developed by the debtor. Although the debtor argued that it had "an obligation to use its best efforts to develop Phase One of the ... development [and] sell the lots," the bankruptcy court found that it had no such obligation and that its only duty was to make a one-time payment to the utility company. KM Grp. , 129 B.R. at 154-55. The debtor had made the required payment before the petition date, and the court therefore found that "nothing further is required of the [d]ebtor." Id. at 155. Not so here. As of the Petition Date, the Debtor had remaining contractual obligations to S & W. And the fact that its financial circumstances precluded the Debtor from fulfilling them does not alter the conclusion that the Distributor Agreement remained executory.
Also, the Distributor Agreement is nothing like the option contract at issue in the decision on which the Committee relies, Bronner v. Chenoweth-Massie Partnership (In re National Financial Realty Trust) , 226 B.R. 586 (Bankr. W.D. Ky. 1998). In National Financial , the bankruptcy court found an option contract to be non-executory because the contract did "not bind the optionee to purchase" but instead "simply grant[ed] the optionee the right or privilege to elect to purchase by tendering the consideration agreed upon within a certain time frame." Id. at 590. Here, the Debtor did not have a mere option to purchase the Products from S & W. To the contrary, as of the Petition Date, the Debtor had an ongoing obligation to use its best efforts to sell the Products, which of necessity required it to purchase the Products from S & W. S & W's obligation to use commercially reasonable efforts to ship Products in accordance with the Debtor's purchase *790 orders was also unperformed as of the Petition Date. The Distributor Agreement does not define the phrase "commercially reasonable efforts," but, as with the "best efforts" clause, it is "not required that ... the term 'commercially reasonable' be precisely defined," Vincent , 2007 WL 1732248, at *2, and "it is abundantly clear that [the 'commercially reasonable efforts' clause] required [S & W] to make at least some effort," Cambridge Biotech , 212 B.R. at 17.
Furthermore, the implied covenant of good faith and fair dealing would require the Debtor and S & W to undertake certain efforts in order to fulfill their respective obligations. The law is "clear in Massachusetts that every contract is subject to an implied covenant of good faith and fair dealing," Anthony's Pier Four, Inc. v. HBC Assocs. , 411 Mass. 451, 583 N.E. 2d 806, 821 (1991), and that distributor agreements are no exception, Cherick Distribs., Inc. v. Polar Corp. , 41 Mass.App.Ct. 125, 669 N.E.2d 218, 220 (1996). In Anthony's Pier Four , the Massachusetts high court held that the covenant of good faith and fair dealing prohibits parties from "do[ing] anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four , 583 N.E. 2d at 820 (quoting Druker v. Roland Wm. Jutras Assocs., Inc. , 370 Mass. 383, 348 N.E.2d 763, 765 (1976) ). Or, as the court later put it, "[t]he purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract, and that, when performing the obligations of the contract, the parties 'remain faithful to the intended and agreed expectations' of the contract." Chokel v. Genzyme Corp. , 449 Mass. 272, 867 N.E.2d 325, 329 (2007) (citations omitted) (quoting Uno Rests., Inc. v. Boston Kenmore Realty Corp. , 441 Mass. 376, 805 N.E.2d 957, 964 (2004) ).
Applying Massachusetts law, a federal court has held that the implied covenant of good faith and fair dealing imposes on a manufacturer the "implied obligation to cooperate with [its sales representative's] 'best efforts' to promote its products." L.G. Balfour Co. v. McGinnis , 759 F. Supp. 840, 845-46 (D.D.C. 1991). Likewise, as of the Petition Date, the implied covenant of good faith and fair dealing required S & W and the Debtor to cooperate as the Debtor undertook its best efforts to comply with its contractual obligation to promote and sell the Products. The Debtor would have breached its obligations under the Distributor Agreement if it had completely failed to place orders, and S & W would have breached its obligations if it had refused to accept purchase orders for reasons not contemplated by the Distributor Agreement. In particular, if commercially reasonable efforts would have enabled S & W to ship the Products to the Debtor while the Debtor itself was complying with the agreement, then S & W would have breached the Distributor Agreement by failing to ship in accordance with the Debtor's purchase orders. The Debtor's failure to purchase and S & W's failure to ship without cause would have had "the effect of destroying or injuring the right of the other party to receive the fruits of the contract," Anthony's Pier Four , 583 N.E.2d at 820, and would have upended "the intended and agreed expectations of the contract," Chokel , 867 N.E.2d at 329. Both parties therefore had ongoing obligations with respect to the Products as of the Petition Date.
On several occasions before the Petition Date, S & W refused to ship goods to the Debtor. Broering Decl. ¶ 9. According to the Debtor, this means S & W had no ongoing obligation to do so. Debtor's Post-Hr'g Br. at 29-30. But this argument does not carry the day. Perhaps S & W had a *791 proper contractual basis under the Distributor Agreement to refuse to ship the Products to the Debtor. If so, this in no way would have vitiated S & W's obligation to ship when it no longer had a valid reason to withhold performance. And even if S & W's failure to ship was unjustified, this would mean only that S & W was not performing its obligation-it would not make its obligation unperformed for purposes of the Countryman definition.
The Debtor also argues that S & W had no ongoing obligation to ship goods to it because the Distributor Agreement made all purchase orders subject to S & W's acceptance. Id. Along the same lines, in arguing against a determination that the Distributor Agreement remained executory on the Petition Date, the Committee relies on (1) the nonexclusive nature of the parties' arrangement, (2) S & W's discretion to evaluate the Debtor's performance and decide whether to extend it credit, and (3) S & W's right to terminate the Distributor Agreement without cause upon 30 days' notice. Comm.'s Post-Hr'g Br. at 12. But none of those provisions negated S & W's obligation to use commercially reasonable efforts to fulfill the Debtor's purchase orders. Massachusetts law provides that "[e]ven if the contract is construed as terminable at will for the future by either party on reasonable notice, that does not necessarily make the contract illusory and unenforceable with respect to any period prior to such a termination." Simons v. Am. Dry Ginger Ale Co. , 335 Mass. 521, 140 N.E.2d 649, 653 (1957) (citations omitted). Rather, the factfinder is "entitled to regard [the contract] as a bilateral contract effective at least until the expiration of a reasonable period following notice of termination." Id. Also, the implied covenant of good faith and fair dealing applies to agreements that are terminable without cause. See Snyder Comput. Sys., Inc. v. Whistler Co. , No. 927147, 1993 WL 818583, at *3-4 (Mass. Super. Ct. Nov. 3, 1993) (rejecting the defendant's argument that the plaintiff's claim should fail because the distributor agreement was an "at will" contract subject only to a "narrowly-defined covenant of good faith"). Thus, the covenant of good faith and fair dealing applies to the Distributor Agreement despite its termination-without-cause provision, and no other provision of the agreement would have permitted S & W to decline to use commercially reasonable efforts to ship the Products while the agreement was in force and the Debtor was complying with it. For all these reasons, the Court concludes that both S & W and the Debtor had unperformed obligations with respect to the Products-S & W to use commercially reasonable efforts to ship them to the Debtor, and the Debtor to use its best efforts to sell and promote them to dealers.
ii. The Materiality of the Obligations
Satisfying the second part of the Countryman definition, the failure to perform these obligations would have constituted a material breach excusing the performance of the other party. Under Massachusetts law, "a material breach of a contract occurs when the breach concerns an 'essential and inducing feature of the contract.' " G4S Tech. LLC v. Mass. Tech. Park Corp. , 479 Mass. 721, 99 N.E.3d 728, 739 (2018) (quoting Anthony's Pier Four , 583 N.E.2d at 819 ). "Essential and inducing features of a contract are provisions that are 'so serious and so intimately connected with the substance of the contract[ ]' that a failure to uphold the provision would justify the other party walking away from the contract and no longer being bound by it." Id. (quoting Buchholz v. Green Bros. Co. , 272 Mass. 49, 172 N.E. 101, 102 (1930) ).
*792 The Debtor and S & W made each of the provisions of the Distributor Agreement material when they agreed that "any breach of [the Distributor Agreement] by the other party that goes uncorrected for a period of 30 days after notice of such breach" would permit the non-breaching party to terminate the agreement for cause. Distrib. Agreement Ex. C. § 8. "[I]t is literally 'hornbook law' that '[w]here the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision.' " Jay Dee/Mole Joint Venture v. Mayor & City Council of Baltimore , 725 F. Supp. 2d 513, 526 (D. Md. 2010) (quoting 23 Williston on Contracts § 63:3 (4th ed. 2002) ). Thus, "if the parties contractually agree that some or all of the terms are sufficiently important to discharge any further obligations imposed on the party aggrieved by a breach, their intent will govern." In re Hawker Beechcraft, Inc. , 486 B.R. 264, 278 (Bankr. S.D.N.Y. 2013) ; see also DataComm Indus. , 407 F.3d at 623-24 (holding that obligation was material "[b]y contractual definition" because the agreement provided for termination upon breach of the obligation). The parties' agreement that any uncorrected breach would give the non-breaching party the right to terminate the Distributor Agreement accordingly renders all of their ongoing obligations material. But see In re LG Philips Displays USA, Inc. , No. 06-10245 (BLS), 2006 WL 1748671, at *5 (Bankr. D. Del. June 21, 2006) ("Recitations of materiality are probative but not dispositive of whether a contract is executory[.]"). But the Court's finding of materiality does not hinge solely on the for-cause-termination provision of the Distributor Agreement, because each party had material obligations under the agreement even without considering that provision.
"The determination of the materiality of a breach must be based largely on a standard of objective reasonableness, rather than purely subjective belief." March VII Inv. Ltd. P'ship v. Kramer , No. CA 15-11917-MLW, 2016 WL 4941985, at *5 (D. Mass. Sept. 14, 2016) (quoting 23 Williston on Contracts § 63:3 (4th ed. 2016) ). From an objective standpoint, there can be no doubt that the provisions of the Distributor Agreement requiring the Debtor to use its best efforts to promote and sell the Products was an essential provision that induced S & W to enter into the agreement. After all, the very reason S & W entered into the Distributor Agreement was so the Debtor could sell the Products to dealers. Thus, the Debtor's failure to use its best efforts to sell the Products and to purchase inventory sufficient to do so would have constituted material breaches excusing the performance of S & W. See S. Shore Imported Cars, Inc. v. Volkswagen of Am., Inc. , No. 09-11570, 2010 WL 1137558, at *4 (D. Mass. Mar. 22, 2010) (holding that dealer committed a material breach of a dealership agreement because the breach implicated "[t]he essence of the ... agreement [which] was to sell cars" and "it [was] inconceivable that [the manufacturer] would have entered into a [dealership agreement] with a franchisee that was incapable of executing the [a]greement's raison d'être"), aff'd , 439 F. App'x 7 (1st Cir. 2011) ; see also In re Cutters, Inc. , 104 B.R. 886, 889 (Bankr. M.D. Tenn. 1989) (finding that the parties' agreement was executory because it imposed "significant future obligations to market slow and obsolete inventory" and because there was "such substantial performance remaining that the breach by one would relieve the other of its obligation to perform").
As with the Debtor's obligations to use best efforts to sell and promote the Products, there can be no doubt that S & W's agreement to use commercially reasonable *793 efforts to ship Products to the Debtor was an essential and inducing provision of the Distributor Agreement. Indeed, the purpose of the agreement from the Debtor's perspective was to purchase Products from S & W so that the Debtor could make money by re-selling the Products to dealers. S & W's failure, without cause, to use commercially reasonable efforts to ship the Products to the Debtor therefore would have constituted a material breach excusing the performance of the Debtor. See Center Garment Co. v. United Refrigerator Co. , 369 Mass. 633, 341 N.E.2d 669, 673 (1976) (affirming trial court's decision that the franchisor's failure to provide supplies ordered by its nonexclusive licensee/franchisee was a breach "so material in all the circumstances as to justify the plaintiff in throwing the contract over and suing for total breach"); In re Sun Ray Bakery, Inc. , 5 B.R. 670, 671-72 (Bankr. D. Mass. 1980) (holding that the manufacturer's "obligation to consign and deliver sufficient quantities of products for distribution" and the consignee's "obligation to distribute those goods according to contract terms" were both material).
In sum, as of the Petition Date, S & W's failure to use commercially reasonable efforts to ship the Products to the Debtor in accordance with its purchase orders and the Debtor's failure to use its best efforts to sell and promote the Products to dealers would have constituted material breaches excusing the performance of the other.
b. S & W's Unperformed Obligation Relating to Its Trade Names and Trademarks
Because S & W's trade names and trademarks play a crucial role in the distribution of the Products, Tr. at 131-32, S & W granted the Debtor a nonexclusive license to use them, Distrib. Agreement § 12.0. Having done so, S & W had an ongoing duty as of the Petition Date to permit the Debtor to use the trade names and trademarks. See In re HQ Glob. Holdings, Inc. , 290 B.R. 507, 511 (Bankr. D. Del. 2003) (holding that the franchisor's grant of a nonexclusive license imposed on it an ongoing obligation "to permit the [f]ranchisees to use the [trademarks] for the life of the licenses"). True, the Debtor must not use the trade names and marks "in a manner that is disapproved by" S & W. Distrib. Agreement § 12.0. But the Debtor's and the Committee's argument that this means that S & W has no obligation to permit the Debtor to use them at all is simply wrong. Examples of uses that might properly be "disapproved of by S & W" include "taking one of [S & W's] competitor's trademarks and putting it over the [S & W] trademark, changing the color, changing the shape, [and] changing ... the font." Tr. at 132. S & W, however, would hinder the Debtor's ability to sell the Products and thereby violate the covenant of good faith and fair dealing if it were to completely prohibit the use of S & W's trade names and trademarks. The Distributor Agreement and Massachusetts law thus require S & W to permit the Debtor to use them in connection with the Debtor's sale of the Products, and any failure by S & W to do so would constitute a material breach of the Distributor Agreement. See HQ Glob. , 290 B.R. at 511 (holding that "[i]nterference with the ... use of the marks would ... be a material breach of the license").
The facts of this case are substantially different from the case on which the Debtor relies, Lewis Brothers Bakeries Inc. v. Interstate Brands Corp. (In re Interstate Bakeries Corp. ), 751 F.3d 955 (8th Cir. 2014). Interstate Bakeries involved the debtor's prepetition sale of certain of its business operations and its execution of a trademark license agreement that was integrated *794 as a single contract with the asset purchase agreement. The Eighth Circuit held that "[w]hen considered in the context of the entire agreement," the debtor's obligation to not interfere with the buyer's right to use the trademarks was "relatively minor and [did] not relate to the central purpose of the agreement to sell the ... operations and assets to [the buyer] in certain territories." Interstate Bakeries Corp. , 751 F.3d at 964. By contrast, as with the franchisor's obligation to permit the franchisee to use the trademarks in HQ Global , S & W's obligation to permit the Debtor to use S & W's trade names and trademarks is not a minor obligation, nor is it unrelated to the purpose of the agreement. To the contrary, in light of the importance that S & W's trade names and trademarks play in the marketing and distribution of the Products, S & W's obligation to permit the Debtor to use them is central to the purpose of the Distributor Agreement.
c. The Debtor's Material Unperformed Obligations With Respect to Applicable Laws
Reflecting the highly-regulated nature of the firearms business, the Distributor Agreement includes provisions requiring the Debtor to take steps to ensure that it is complying with all applicable laws. The Debtor and the Committee argue that these obligations do not count for purposes of the executoriness analysis because they are owed to governmental authorities, not S & W. They are wrong for two reasons. First, certain of the provisions go beyond what the law itself requires, imposing on the Debtor obligations that are owed only to S & W, not to governmental authorities. For example, the Distributor Agreement requires the Debtor to "[e]mploy sufficient adequately trained and competent personnel who will follow all federal, state and local laws, statutes, ordinances and regulations relating to the sale and distribution of firearms during the term of this Agreement." Distrib. Agreement § 3.2 (emphasis added). The Distributor Agreement also requires the Debtor to "conduct its operations and the distribution and sale of the Products ethically ... so that the name and reputation of [S & W] and its Products shall not be adversely affected ." Id. § 6.0 (emphasis added). The argument that obligations owed to the government do not count for purposes of the executoriness analysis simply ignores these provisions.
Second, while other sections of the Distributor Agreement do in fact impose duties on the Debtor that it also owes to governmental authorities, had the Debtor failed to comply with these obligations, it would have been in material breach of the agreement, thereby excusing further performance by S & W. These dual obligations include maintaining all required licenses, complying with all laws relating to the sale and distribution of firearms and accessories, and maintaining all required books and records relating to the sale or distribution of firearms. Id. §§ 3.1-3.5. In addition, § 6 of the Distributor Agreement requires the Debtor to "conduct its operations and the distribution and sale of the Products ... strictly in accordance with the letter and the spirit of all applicable laws[.]" Id. § 6.0. The Debtor itself acknowledged in the Distributor Agreement that "compliance with the provisions of [§ 6 is] a material condition and term to th[e] [Distributor] Agreement" and that "failure to comply with the provisions of [that] section affords [S & W] the right to terminate th[e] [Distributor] Agreement without further obligation, right by the [Debtor] to cure or liability on the part of [S & W]." Id.
Even if the Debtor had not made this express acknowledgment with respect to *795 its duty to comply with the law, the obligations that the Debtor owes both to S & W and to governmental authorities-like the duties that are owed only to S & W-are material obligations the breach of which would permit S & W to terminate the agreement for cause. Indeed, numerous other courts "applying the same [or substantially similar] 'obey all laws' provision ... have held that a failure to comply with federal or local law is a material breach warranting termination of the [contract]." Dunkin' Donuts Inc. v. Martinez , No. 01-3589-Civ, 2003 WL 685875, at *9 (S.D. Fla. Feb. 21, 2003) (citing cases). See also, e.g. , Steadfast Ins. Co. v. Forsyth Int'l, Inc. , No. 13-12169-GAO, 2014 WL 4966050, at *8 (D. Mass. Sept. 30, 2014) (holding that defendant's breach of its "obligation to comply with environmental laws" constituted a material breach of a lease); Tate & Lyle Ingredients Americas, Inc. v. Transp. Distrib., LLC , 746 F. Supp. 2d 189, 198 (D. Me. 2010) (granting plaintiff's motion for summary judgment on claim for breach of material term of a contract to "agree to comply with all state laws"); Milner Hotels, Inc. v. Norfolk & W. Ry. Co. , 822 F. Supp. 341, 347 (S.D. W. Va. 1993) (concluding that the "violation of fire and electrical codes ... constituted a material breach" of a party's obligation "to comply with applicable laws and regulations concerning the operation of a hotel"), aff'd , 19 F.3d 1429 (4th Cir. 1994).
The case on which the Debtor relies, South Chicago Disposal, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.) , 130 B.R. 162 (S.D.N.Y. 1991), is not to the contrary. In Chateaugay , the debtor and a waste hauler entered into contracts in the form of purchase orders under which the hauler agreed to transport and dispose of waste material generated by the debtor. The purchase orders "compel[led] compliance with state and federal laws and regulations in connection with the handling of the wastes." Chateaugay , 130 B.R. at 165. The district court held that this provision did not make the purchase orders executory because, as of the date of the debtor's bankruptcy filing, the hauler had already completely removed, transported and disposed of all of the waste that was the subject of the purchase orders. That is, the hauler had entirely performed its contractual obligations as of the date the debtor's bankruptcy case was commenced, and as a result any obligation the hauler had to comply with the law was "not owed to [the debtor], but rather to the state and federal authorities." Id. Unlike in Chateaugay , the Debtor here had not as of the Petition Date completed the performance-using its best efforts to sell the Products-that the Distributor Agreement obligated it to undertake in accordance with all applicable laws.
True, under the principle that "[p]erformance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration," Restatement (Second) of Contracts § 73 (1981), the Distributor Agreement might have lacked consideration if the duty to comply with the law had been the only obligation the agreement imposed on the Debtor. See Redlich v. Lanell , No. SUCV200203213C, 2006 WL 1000353, at *24 (Mass. Super. Ct. Mar. 3, 2006). But the Debtor's duty to comply with the law was not its only obligation under the Distributor Agreement, and no party contends that there was a failure of consideration when the parties entered into the agreement. A contract having been formed, the Debtor had an ongoing obligation to S & W as of the Petition Date to sell the Products only in accordance with the law, and the case law amply supports the view that the Debtor's failure to do so would constitute a material breach excusing S & W's *796 performance under the Distributor Agreement.
d. Summary of the Parties' Material Unperformed Obligations
To summarize, the material unperformed obligations that the parties had under the Distributor Agreement on the Petition Date include:
• The Debtor's obligation to use its best efforts to promote and sell the full range of Products and to purchase and maintain a sufficient inventory of the Products.
• S & W's obligation to use commercially reasonable efforts to ship the Products to the Debtor in accordance with the Debtor's purchase orders.
• S & W's obligation to permit the Debtor to use S & W's trade names and trademarks in connection with the sale of the Products.
• The Debtor's obligation to comply with all laws and regulations relating to the sale and distribution of the Products during the term of the Distributor Agreement.
• The Debtor's obligations to take certain steps-such as hiring sufficient adequately trained and competent personnel-to ensure that it is complying with all applicable laws.
For all the reasons explained above, the Court concludes that on the Petition Date both the Debtor and S & W had unperformed obligations under the Distributor Agreement and that the failure to perform those obligations would constitute a material breach excusing the performance of the other, making the Distributor Agreement executory under the Countryman definition. The Court will now discuss why the Distributor Agreement also is executory under the functional test.
2. The Functional Test
In Chattanooga Memorial Park v. Still (In re Jolly) , 574 F.2d 349 (6th Cir. 1978), a case decided under the Bankruptcy Act, the Sixth Circuit was faced with the question of "whether the executory contract provisions ... have any application to a contract ... which has already been breached by the debtor and reduced to final judgment" before the debtor commenced its bankruptcy case. Jolly , 574 F.2d at 350. In the course of holding that the predecessor of § 365 was inapplicable on those facts, the Sixth Circuit stated that the Countryman definition was "helpful but do[es] not resolve this problem." Id. at 351. Instead, under the circumstances present in Jolly , the "key ... to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish." Id. "If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory[.]" Id. This has come to be known as the "functional test."
According to the Sixth Circuit Bankruptcy Appellate Panel, the functional test of Jolly "is consistent with Terrell [and its holding that the Countryman definition was the one that Congress intended courts to apply] because an obligation to pay a court judgment translates to performance being due only on one side per the Countryman definition." Ravenswood Apartments , 338 B.R. at 312. Notably, the Jolly court itself concluded that the contract at issue in that case was non-executory because the debtor's "duty was in the past, he has breached that duty, and had judgment entered against him for that breach," meaning there was "no obligation for the debtor to do anything in the future." Jolly , 574 F.2d at 351. Providing further evidence that the existence of a future obligation *797 is relevant when conducting the functional analysis, a later Sixth Circuit panel-after setting forth's Jolly 's functional test-found that both parties "had obligations to perform in the future" and concluded on the basis of that finding alone that the agreement under consideration was executory. Sloan v. Hicks (In re Becknell & Crace Coal Co.) , 761 F.2d 319, 322 (6th Cir. 1985). In short, the functional test "encompasses the Countryman test by including the need for future obligations, the relief from which is one of the main purposes to be accomplished by rejection." In re DMR Fin. Servs., Inc. , 274 B.R. 465, 470 (Bankr. E.D. Mich. 2002).
"[E]ven though there may be material obligations outstanding on the part of only one of the parties to the contract, it may nevertheless be deemed executory under the functional approach if its assumption or rejection [would] ultimately benefit the estate and its creditors." In re Structurlite Plastics Corp. , 86 B.R. 922, 928 (Bankr. S.D. Ohio 1988) (quoting Arrow Air v. Port Auth. of N.Y. & N.J. (In re Arrow Air, Inc. ) , 60 B.R. 117, 122 (Bankr. S.D. Fla. 1986) ). In this way, the functional test is less stringent than the Countryman definition. Given this, "[a] court may find a contract is executory under the functional approach, even though it might not have found the contract to be executory under the Countryman test." Phar-Mor, Inc. v. Strouss Bldg. Assocs. , 204 B.R. 948, 952 (N.D. Ohio 1997). But there is simply no basis under Sixth Circuit law to conclude that a contract is executory under the Countryman definition and non-executory under the functional test. Indeed, as several other courts have held, because "[t]he Countryman test is more stringent, ... if a contract is executory under that test, it is also executory under the [f]unctional test." In re Ellipsat, Inc. , 480 B.R. 1, 7 n.5 (Bankr. D.D.C. 2012) ; see also Shoppers World Cmty. Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.) , No. 00-16033 (BRL), 2001 WL 1112308, at *7 (S.D.N.Y. Sept. 20, 2001) (holding that the bankruptcy court did not err in concluding that a contract was executory under the Countryman definition and accordingly declining to review its decision under the more lenient functional test); Helm , 335 B.R. at 535 ("The Countryman definition is generally accepted as the most stringent test, and thus, if a contract is executory under that standard, the contract is necessarily executory under the [functional test]." (citation omitted)); Phar-Mor , 204 B.R. at 952 n.2 ("The reason the Terrell court never undertook a functional analysis was because in that case, the Countryman test alone so clearly revealed the contracts in question were executory.").
Not surprisingly, then, the Distributor Agreement, which is executory under the Countryman definition, also is executory under the functional test. In particular, the Distributor Agreement is executory under the functional test because the rejection of the Distributor Agreement would benefit the estate by preserving the bankruptcy estate's rights with respect to the Preference Claim while also relieving the estate of the Debtor's ongoing obligations under the agreement, including its obligations to promote and sell the Products.
The fact that the rejection of the Distributor Agreement would benefit the estate means, of course, that its assumption would harm the estate. The Debtor contends that the Distributor Agreement is not executory under the functional test for that very reason-because "the evidence establishes that [the] Debtor, on the whole, would be harmed by the assumption" of the agreement. Debtor's Post-Hr'g Br. at 25. Or, as the Committee puts it, "if the assumption and assignment of a contract *798 ... does not add value, or harms the estate, the contract should be deemed non-executory." Comm.'s Post-Hr'g Br. at 19. The Debtor and the Committee, however, are misapplying the functional test.
There is no doubt that a contract is executory under the functional test if rejecting it would benefit the bankruptcy estate by relieving the estate of unperformed obligations owed by the debtor. But it does not follow from that proposition or anything in the cases on which the Debtor and the Committee rely that a contract is non-executory under the functional test merely because assuming the contract would harm the estate. In the first decision they offer as support for their position, Structurlite , the bankruptcy court noted that "the purpose for allowing the debtor in possession to reject or assume an executory contract [under the functional test] 'is to enable ... a troubled debtor to take advantage of a contract that will benefit the estate by assuming it or alternatively, to relieve the estate of a burdensome contract by rejecting it.' " Structurlite , 86 B.R. at 928 (quoting Arrow Air , 60 B.R. at 122 ). Similarly, in Huntington Nat'l Bank Co. v. Alix (In re Cardinal Indus., Inc.) , 146 B.R. 720 (Bankr. S.D. Ohio 1992), the bankruptcy court concluded that "even though there may be material obligations outstanding on the part of only one of the parties to the contract, a contract may nevertheless be deemed executory under the functional approach if its assumption or rejection will ultimately benefit the estate and its creditors." Cardinal Indus. , 146 B.R. at 729. That is, these decisions provide support for the notion that a contract is executory if either assumption or rejection would benefit the bankruptcy estate.
Under Structurlite and Cardinal , a contract is executory if rejecting it would benefit the estate by allowing it to shed burdensome obligations owed by the debtor to the contract's counterparty. Likewise, a contract is executory if assuming it would benefit the estate by allowing it to receive the performance still owed by the counterparty. This was the case in another decision on which the Debtor relies, In re VisionAmerica, Inc. , No. 01-24615-B, 2001 WL 1097741 (Bankr. W.D. Tenn. Sept. 12, 2001), in which the bankruptcy court held that "[i]f the result of the assumption is to add value or benefit to the bankruptcy estate, the functional approach would suggest that the contract is executory." Id. at *4.[9] There is, however, simply nothing in these cases or any other decision supporting a theory of executoriness under which an agreement is non-executory merely because assuming it would harm the estate. By any measure, therefore, the Distributor Agreement is an executory contract that Ellett could have designated for assumption and assignment by the deadline imposed by § 2.5 the APA.
*799 B. The Designation of Executory Contracts for Assumption and Assignment in the Context of an Asset Purchase Agreement
The Committee, however, contends that giving buyers unfettered discretion to designate executory contracts for assumption and assignment would subvert debtors' business judgment. Comm.'s Post-Hr'g Br. at 29-30. But provisions similar to § 2.5 of the APA have regularly been approved by other courts as a proper exercise of debtors' business judgment in connection with asset sales. See, e.g. , In re Weinstein Co. Holdings LLC , No. 18-10601, Doc. 846 (Bankr. D. Del. May 9, 2018) (order approving asset purchase agreement under which the purchaser had the right to designate contracts for assumption and assignment); In re DirectBuy Holdings, Inc ., No. 16-12435, Doc. 377, 2017 WL 5496219 (Bankr. D. Del. Feb. 14, 2017) (order approving asset purchase agreement (Doc. 18, Ex. C at 3) that defined "Assumed Contracts" as "all Contracts set forth on Schedule 2.1(l); provided, however, that, at any time prior to two (2) Business Days before entry of the Approval Order by the Bankruptcy Court, the Buyer may amend Schedule 2.1(l) to remove any Contract therefrom or add any Contract thereto"); In re Ames Dep't Stores, Inc. , 287 B.R. 112, 125-27 (Bankr. S.D.N.Y. 2002) (holding that the sale of the right to designate executory contracts for assumption and assignment was an appropriate exercise of the debtor's business judgment); In re G Survivor Corp. , 171 B.R. 755, 759 (Bankr. S.D.N.Y. 1994) (holding that the purchaser's "ability to designate which contracts it wished to have rejected was a valuable right, for which [the purchaser] bargained" and that the debtor's "decision to sell that right was a proper exercise of its business judgment"), aff'd sub nom. John Forsyth Co. v. G Licensing, Ltd. , 187 B.R. 111 (S.D.N.Y. 1995).
A case on which the Committee relies that at first glance might appear to be contrary to the sale of designation rights in fact is not. In File v. Boersen Farms, Inc. (In re Stamp Farms, L.L.C.) , No. 13-80184, 2014 WL 1017041 (Bankr. W.D. Mich. Mar. 13, 2014), the bankruptcy court stated that "Congress naturally vested the authority and discretion to make [contract assumption and rejection] decisions in the [debtor in possession]" and that "[t]he court is unwilling to authorize unfettered delegation of this discretion." Id. at *8. Though it may sound like the Stamp Farms court was disapproving of provisions such as § 2.5(a) of the APA, when read in context it is clear that the court was doing no such thing. In Stamp Farms , the debtor's court-approved asset purchase agreement with Boersen Farms provided that the debtor would assume and assign to Boersen each lease included on an exhibit to the purchase agreement, but that Boersen could remove leases from the exhibit before a specified deadline after the closing. At the closing, the debtor executed an assignment of the leases on the exhibit in accordance with the asset purchase agreement. After the deadline for removing leases from the exhibit expired, Boersen argued that a lease included on the exhibit should be deemed rejected even though it had failed to remove the lease from the exhibit by the deadline.
According to Boersen, the lease should have been deemed rejected because the debtor had assigned its "statutory rights to assume or reject leases under § 365" to it and Boersen "never took steps to formally assume the [lease]." Id. The court rejected the buyer's argument "as utterly inconsistent with the Purchase Agreement, the Sale Order, and the Bankruptcy Code." Id. In other words, the bankruptcy *800 court enforced the purchase agreement and the sale order according to their terms, which made clear that the lease had been assumed and assigned because the buyer had not removed the lease from the assumption schedule before the deadline. If the buyer had done so in a timely manner, the bankruptcy court would have enforced the purchase agreement and the sale order by holding that the lease was rejected. Enforcement would have been ordered because "Boersen Farms bargained for a mechanism by which it might cause certain assets to be treated as 'Excluded Assets' " under the purchase agreement and because such a provision "does not amount to an assignment of a debtor's statutory rights under § 365." Id.
C. The Plain Language of the Sale Order
The problem for S & W and Ellett is twofold: (1) Ellett failed to designate the Distributor Agreement for assumption and assignment by the deadline imposed by § 2.5(a) of the APA; and (2) the Sale Order carved the Distributor Agreement out of § 2.5(a). Although S & W and Ellett clearly would have won this fight if the Distributor Agreement had remained subject to § 2.5(a) of the APA, it is just as clear that they must lose under the terms of the Sale Order.
Because the parties negotiated the terms of the Sale Order, it is essentially an agreed order. "An agreed order ... is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation." City of Covington v. Covington Landing Ltd. P'ship , 71 F.3d 1221, 1227 (6th Cir. 1995) ; Lefkowitz v. Mich. Trucking, LLC (In re Gainey Corp.) , No. 11-8038, 2012 WL 3938521, at *2 (6th Cir. BAP Sept. 11, 2012). When construing an order "according to general contract principles," courts must "look[ ] at the entire document as part of an integrated whole, rather than looking at each provision in isolation." E. Coast Miner LLC v. Nixon Peabody LLP (In re Licking River Mining, LLC) , 911 F.3d 806, 812 (6th Cir. 2018).
If reviewing an order in its entirety leads to the conclusion that it is unambiguous, then it must be enforced as written, because the court "must carry out and enforce an order that is clear and unambiguous on its face." Travelers Indem. Co. v. Bailey , 557 U.S. 137, 150, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009) (quoting Negrón-Almeda v. Santiago , 528 F.3d 15, 23 (1st Cir. 2008) ). This is true notwithstanding evidence that one of the parties understood the language to mean something different from its plain meaning, because despite a party's subjective belief regarding the order's meaning, "where the plain terms of a court order unambiguously apply, ... they are entitled to their effect." Id. As the Supreme Court held in Travelers , "[i]f it is black-letter law that the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective intent, it is all the clearer that a court should enforce a court order, a public governmental act, according to its unambiguous terms." Id. at 150-51, 129 S.Ct. 2195 (citation omitted). Furthermore, "[d]isagreement between the parties as to an interpretation of the language does not create ambiguity in the legal sense." Marquette Gen. Hosp. v. Goodman Forest Indus. , 315 F.3d 629, 632 n.1 (6th Cir. 2003).
The Sale Order does not say whether state or federal law governs its interpretation, and analogous case law is split. See In re Tres Hermanos Dairy, LLC , No. 11-10-14240-TR, 2014 WL 176772, at *6 (Bankr. D.N.M. Jan. 16, 2014) (noting the "split of authority whether state or federal common law should be *801 used to interpret plans and confirmation orders" and identifying federal appellate courts on both sides of the divide). On one side, the Ninth Circuit has held that state law governs. See Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n , 997 F.2d 581, 588 (9th Cir. 1993). On the other, the Seventh Circuit has suggested without holding that it would decline to follow Hillis Motors and instead apply federal law when interpreting plans and confirmation orders. See In re Harvey , 213 F.3d 318, 321-22 (7th Cir. 2000). But the Sixth Circuit, citing Hillis Motors , stated in an unreported decision that it would "utilize state law to interpret the plan" in that case. Guardian Sav. & Loan Ass'n v. Arbors of Houston Assocs. Ltd. P'ship (In re Arbors of Houston Assocs. Ltd. P'ship) , No. 97-2099, 1999 WL 17649, at * 3 (6th Cir. Jan. 4, 1999). Here, it does not matter whether the Sixth Circuit would continue to apply state law as it did in Arbors of Houston or instead adopt the federal-law approach, because under federal law as well as potentially applicable state law (both the law of Massachusetts governing the APA and the law of Ohio where the Court sits), the result is the same: "[a] contract is not ambiguous unless it is subject to more than one reasonable interpretation." CNH Indus. N.V. v. Reese , --- U.S. ----, 138 S.Ct. 761, 763, 200 L.Ed.2d 1 (2018) (applying federal common law) ; see also In re AmTrust Fin. Corp. , 694 F.3d 741, 750 (6th Cir. 2012) (same); Hershman-Tcherepnin v. Tcherepnin , 452 Mass. 77, 891 N.E.2d 194, 202 (2008) (holding that contractual language "create[d] an ambiguity because it [was] susceptible to two meanings"); Look v. H & M Custom Home Builders Co. , No. 2011-G-3036, 2012 WL 2522647, at *3 (Ohio Ct. App. June 29, 2012) ("Contractual terms are ambiguous if their meaning cannot be deciphered from reading the entire instrument or if the terms are reasonably susceptible to more than one interpretation.").
The Sale Order is subject to only one reasonable interpretation: The Debtor and the Committee-notwithstanding § 2.5(a) of the APA-have the right to object to the assumption and assignment of the Distributor Agreement for any reason, including the harm that would befall the Debtor's bankruptcy estate. Accordingly, S & W misses the mark in contending that "the only legitimate objection that should be considered by this Court is whether the Distributor Agreement ... is an executory contract that can be assigned to Ellett under section 365 of the Bankruptcy Code." S & W's Pre-Hr'g Br. at 5.
1. Paragraph 19 of the Sale Order
Although it will not end there, the analysis begins with ¶ 19 of the Sale Order. For the convenience of the reader, the Court again quotes the paragraph in its entirety:
Notwithstanding Section 2.5(a) of the APA, [Ellett] shall have until 5:00 p.m. Eastern Time on July 5, 2018[10] (the "S & W Designation Deadline" ) to designate [the Distributor Agreement] as an Assigned Contract that shall be assumed and assigned, pursuant to paragraph 18 hereof, subject to the right of any party-in-interest to object to the [Notice of Designation] for any reason, including, but not limited to, challenging whether *802 the [Distributor Agreement] is a contract that can be assumed and assigned under section 365 of the Bankruptcy Code. Such designation shall be evidenced by the filing of a notice with the Court (and served on all parties listed in Section H hereof) by [Ellett] by the S & W Designation Deadline (the "[Notice of Designation]" ). Any party in interest, including, but not limited to the Debtor and the Committee, shall have until 5:00 p.m. Eastern Time on July 16, 2018 to file any opposition to the [Notice of Designation], upon which the Court may enter an order setting a hearing and briefing schedule related to such dispute. In the event that no such opposition is filed by 5:00 p.m. Eastern Time on July 16, 2018, then the [Distributor Agreement], subject to all rights, claims and defenses, including recoupment and setoff, shall be deemed assigned to [Ellett] as an Assigned Contract.
Sale Order ¶ 19.
Paragraph 19 begins with the phrase "[n]otwithstanding Section 2.5(a) of the APA." Such phrases are known as "notwithstanding clauses," and their effect is well established. "[T]he term 'notwithstanding' functions in its normal supplanting way: it simply excludes application of the referenced section." Deutsche Bank Nat'l Tr. Co. v. Tucker , 621 F.3d 460, 464 (6th Cir. 2010) ; see also United States v. Robinson (In re Robinson) , 764 F.3d 554, 560 (6th Cir. 2014) (discussing the effect of notwithstanding clauses). There is nothing ambiguous about notwithstanding clauses. In fact, "[a] clearer statement is difficult to imagine." Cisneros v. Alpine Ridge Grp. , 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) (quoting Liberty Maritime Corp. v. United States , 928 F.2d 413, 416 (D.C. Cir. 1991) ).
Courts have described such provisions as "carve-outs." See, e.g. , Ind. Elec. Workers Pension Tr. Fund v. Millard , No. 07 Civ. 172 (JGK), 2007 WL 2141697, at *3 (S.D.N.Y. July 25, 2007) (describing a statute that began with a notwithstanding clause as the "Delaware carve-out"); Warner v. CitiFinancial, Inc. (In re Warner) , 446 B.R. 651, 655 (Bankr. D. Vt. 2011) (holding that a statute's "notwithstanding" clause "indicates the legislature's intent to carve out from the general provision ... a different rule"), aff'd , No. 10-11089, 2011 WL 2711422 (D. Vt. July 12, 2011) ; Official Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc. ), 453 B.R. 201, 212 (Bankr. S.D.N.Y. 2011) (holding that § 546(e) of the Bankruptcy Code, which begins with the phrase "[n]otwithstanding section[ ] ... 547," "carves out a limited exception to section 547(b)"), aff'd , 480 B.R. 468 (S.D.N.Y. 2012), aff'd , 719 F.3d 94 (2d Cir. 2013). Like other provisions of its kind, the opening clause of ¶ 19 strongly signals the role the paragraph plays-it "override[s] conflicting provisions" of the section to which it refers, here § 2.5(a) of the APA. Cisneros , 508 U.S. at 18, 113 S.Ct. 1898.
Paragraph 19 of the Sale Order appoints Ellett as the party entitled to designate the Distributor Agreement as an Assigned Contract, and in that one respect it is consistent with § 2.5(a) of the APA. But the rest of ¶ 19-including the part that affords the Debtor and the Committee the right to object to the designation "for any reason"-is entirely inconsistent with § 2.5(a), which provided no such right. Section 19 of the Sale Order states plainly that the designation is "subject to the right of any party-in-interest to object to the [Notice of Designation] for any reason, including, but not limited to, challenging whether the [Distributor Agreement] is a contract that can be assumed and assigned under *803 section 365 of the Bankruptcy Code." Sale Order ¶ 19. The Sale Order continues by permitting an objection to be filed by "[a]ny party in interest, including, but not limited to the Debtor and the Committee." Id. And it further provides that, upon the filing of an objection, the Court "may enter an order setting a hearing and briefing schedule related to such dispute," with the Distributor Agreement to "be deemed assigned to [Ellett] as an Assigned Contract" if no objections are filed. Id. Because ¶ 19 overrides conflicting provisions of § 2.5(a) of the APA, it clearly is a carve-out, with the rights of the Debtor and the Committee to object governed by ¶ 19 rather than § 2.5(a) of the APA.
Paragraph 19's status as a carve-out is further evidenced by the language making Ellett's designation "subject to" the right of parties in interest to object. The phrase "subject to" can have various meanings, but the natural sense of the term as used in ¶ 19 is "likely to be conditioned, affected, or modified in some indicated way: having a contingent relation to something and usually dependent on such relation for final form, validity, or significance." Webster's Third New International Dictionary, Unabridged , s.v. "subject," accessed May 9, 2019, http://unabridged.merriam-webster.com. Webster's uses the example of "a treaty subject to ratification." Id. Just as a treaty must overcome objections to ratification and be ratified in order to become effective, Ellett's designation of the Distributor Agreement for assumption and assignment must withstand the objection process laid out in ¶ 19 and be approved by the Court in order for the assumption and assignment to become effective.
Moreover, it could not be any clearer that ¶ 19 imposes no limitations whatsoever on the nature of the objections that the Debtor and the Committee may assert. Ellett's designation is subject to their objection "for any reason," which in this context means "one that is selected without restriction or limitation of choice." Webster's Third New International Dictionary, Unabridged , s.v. "any," accessed May 9, 2019, http://unabridged.merriam-webster.com; see, e.g. , Nan Ya Plastics Corp. v. United States , 810 F.3d 1333, 1346 (Fed. Cir. 2016) ("The word 'any' is the key modifier in the phrase in question. 'Any' means 'one that is selected without restriction or limitation of choice.' "); United States v. Martinez , 122 F.3d 421, 424 (7th Cir. 1997) ("Certainly 'any court' includes a military court, the adjective 'any' expanding the term 'court' to include 'one or some indiscriminately of whatever kind'; 'one that is selected without restriction or limitation of choice'; or 'all.' "). The term " '[a]ny' covers everything in a category or class" and "excludes exceptions unless they are specifically given." United States v. Nat'l City Lines , 80 F. Supp. 734, 742 (S.D. Cal. 1948) ; see also United States v. Rosenwasser , 323 U.S. 360, 363, 65 S.Ct. 295, 89 L.Ed. 301 (1945) ("The use of the words 'each' and 'any' to modify 'employee,' which in turn is defined to include 'any' employed individual, leaves no doubt as to the Congressional intention to include all employees within the scope of the Act unless specifically excluded."). That is, "any" "has the force of 'every' or 'all.' " Bank One, N.A. v. Echo Acceptance Corp. , 380 F. App'x 513, 522 n.6 (6th Cir. 2010) (quoting Motor Cargo, Inc v. Bd. of Twp. Trustees of Richfield Twp. , 117 N.E.2d 224, 227 (Ohio Ct. Com. Pl. 1953) ). On top of all this, before expressly stating that the Debtor and the Committee could "challeng[e] whether the [Distributor Agreement] is a contract that can be assumed and assigned under section 365 of the Bankruptcy Code," the Sale Order provides that the right to object "includ[es], but [is] not limited to" a challenge on those grounds. Sale Order ¶ 19. That was, of course, already the case. After all, parties *804 in interest had the right to object "for any reason."
S & W and Ellett argue that "the reference to 'any reason' must mean any reason permissible under the APA." Ellett's Post-Hr'g Br. at 14. But the Court would need to add language to the Sale Order in order to limit the scope of permissible objections in the way S & W and Ellett suggest. The phrase "for any reason" would need to become something like "for any reason permissible under the APA," or "for any reason that a party in interest could have objected to the designation of the Distributor Agreement if Ellett had designated the agreement for assumption and assignment within the time period originally contemplated by the APA." The Court, however, is not permitted to construe unambiguous text by adding to it. See, e.g. , 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States , 340 U.S. 593, 596, 71 S.Ct. 515, 95 L.Ed. 566 (1951) ("It is for [the courts] to ascertain-neither to add nor to subtract, neither to delete nor to distort."); Awbrey v. Pennzoil Co. , 961 F.2d 928, 930 (10th Cir. 1992) ("A court is without authority to alter or amend contract terms and provisions absent an ambiguity in the contract."). Because the Sale Order is clear and unambiguous, the Court "must carry out and enforce" it as written by permitting the Debtor and the Committee to object to the Notice of Designation for any reason. Travelers Indem. Co. , 557 U.S. at 150, 129 S.Ct. 2195. Contrary to the arguments made by S & W and Ellett, S & W's Pre-Hr'g Br. at 6, the Debtor and the Committee are not collaterally attacking the Sale Order, but instead are merely seeking to enforce it.
2. Other Provisions of the Sale Order and the APA
Faced with the clear language of ¶ 19 of the Sale Order, S & W and Ellett take a scattershot approach in attempting to obfuscate it, citing multiple paragraphs of the Sale Order and the APA. But after examining each of those provisions-as the Court must in order to ensure that it has considered the parties' agreement as "an integrated whole," Licking River Mining , 911 F.3d at 812 -it remains clear that the Sale Order affords the Debtor and the Committee the right to object to the Notice of Designation for any reason.
S & W and Ellett first point to several paragraphs of the Sale Order that apply to "Assigned Contracts" and "Purchased Assets" (a term that includes Assigned Contracts). See, e.g. , Sale Order ¶¶ U, V, W, EE, 18 & 32. In relying on these provisions, S & W and Ellett completely ignore one salient fact: the Distributor Agreement is neither an Assigned Contract nor a Purchased Asset. For although the Sale Order provides that the Distributor Agreement "shall be deemed assigned to [Ellett] as an Assigned Contract," it also states that this is so only "[i]n the event that no ... opposition is [timely] filed." Id. ¶ 19. Because objections were timely filed to the Notice of Designation, the Distributor Agreement would become an Assigned Contract and a Purchased Asset only if the Court were to overrule the objections. The Court, however, is sustaining the objections. As a result, the provisions of the Sale Order that are applicable to Assigned Contracts and Purchased Assets do not apply to the Distributor Agreement. S & W and Ellett also rely on other provisions of the Sale Order, including those providing that the Debtor's sale motion and the APA are in the best interests of the Debtor and its estate. Those provisions, however, must be read in context, and that context is a Sale Order providing that objections to the Notice of Designation could be filed for any reason. [11]
*805 In light of the broad-based objection rights afforded the Debtor and the Committee, the APA and its approval were indeed in the best interests of the Debtor. No provision of the Sale Order other than § 2.5(a) is inconsistent with the rights of the Debtor and the Committee to object to the Notice of Designation for any reason. Given all this, there was no reason for ¶ 19's notwithstanding clause to state, as S & W and Ellett argue it should have in order to be effective, "notwithstanding anything in this Sale Order."
Nor was there any reason for the notwithstanding clause to state "notwithstanding anything in the APA." Arguing to the contrary, S & W and Ellett rely on four sections of the APA-§§ 2.1, 2.5(d), 4.6, and 11.6-that refer to "Assigned Contracts" or "Purchased Assets." Section 2.1 provides for the sale of the "Purchased Assets," including "all Assigned Contracts set forth on Section 2.5 of the Disclosure Schedules," § 2.5(d) requires the Debtor to "include in its Bankruptcy Court pleadings relief to assume and assign to [Ellett] all executory Contracts and unexpired Leases related to the Business and the Purchased Assets," and § 4.6 states that "[u]pon entry of the Sale Order and payment of the Cure Amounts, the Assigned Contracts shall be assigned by [the Debtor] to [Ellett]." As explained above, because the assumption and assignment of the Distributor Agreement is not being approved, the Distributor Agreement is not included among the Assigned Contracts or the Purchased Assets. Instead, the Distributor Agreement is one of the "Contracts that are not Assigned Contracts," making it one of the "Excluded Assets." APA § 2.2(c). Thus, §§ 2.1, 2.5(d) and 4.6 of the APA simply do not apply to the Distributor Agreement.
S & W and Ellett also rely on § 11.6 of the APA, which provides that "[i]n the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, ... the statements in the body of this Agreement will control." APA § 11.6. In turn, the APA defines "Transaction Documents" to include the "Sale Order, and the other agreements, instruments, and documents required to be delivered at the Closing." Id. at 8-9. According to S & W and Ellett, "the APA [therefore] takes precedence over every other document, including the Sale Order." S & W's Post-Hr'g Br. at 33; see also Ellett's Post-Hr'g Br. at 16 n.18. Not so. As an initial matter, the Sale Order provides that "[t]o the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion filed in this Case, the terms of this Order shall govern." Sale Order ¶ 38. "Pleading with respect to the Sale Motion" arguably includes the Sale Motion and the APA appended to it.
And even if this were not the case, S & W's and Ellett's argument that the APA
*806 must take precedence over the Sale Order proves too much. The APA gave Ellett "until the second business day prior to the Closing Date" (i.e., until June 27, 2018) to designate the Distributor Agreement for assumption and assignment, while the Sale Order provided it (subject to the rights of parties in interest to object) until a time certain on July 5, 2018. The APA and the Sale Order therefore are inconsistent with respect to the date by which Ellett was required to make the designation. If S & W and Ellett were correct that the APA must control over the Sale Order, then Ellett had only through June 27, 2018 (the date calculated in accordance with the APA) to designate the Distributor Agreement for assumption and assignment. Having made the designation on July 5, 2018, Ellett was more than a week late, meaning that the Notice of Designation would necessarily be denied on the basis of untimeliness alone. In other words, if S & W and Ellett were correct about the effect of § 11.6, then Ellett would be hoisted by its own petard. Thus, S & W's and Ellett's argument based on § 11.6 of the APA falls flat.
Ellett points out that it cannot be held to have waived its rights under the APA because "[n]o waiver by any Party of any provisions [of the APA] shall be effective unless explicitly set forth in writing and signed by the Party so waiving." Ellett's Post-Hr'g Br. at 15 (quoting § 11.9 of the APA). According to Ellett, construing ¶ 19 as written would constitute a waiver of Ellett's absolute right to designate the Distributor Agreement for assumption and assignment without Ellett having waived its rights in a signed writing. Under the APA, however, Ellett had the absolute right to designate the Distributor Agreement for assignment only up through two days before the closing, or June 27, 2018. If Ellett had made the designation by that date and the Debtor and the Committee were nonetheless opposing the designation, then the Court would need to consider whether ¶ 19 waived Ellett's absolute right to make the designation by the deadline established by the APA. But because Ellett failed to exercise its rights under the APA, the concept of waiver does not come into play.
S & W and Ellett argue that there is evidence demonstrating that ¶ 19 "merely provided Ellett with additional time to decide whether to exercise its right to add the Distributor Agreement to the Purchased Assets." S & W's Post-Hr'g Br. at 32; see also Ellett's Post-Hr'g Br. at 13-14. The evidence on which they rely is Mr. Johnson's testimony intimating that he believed ¶ 19 merely to be an extension. S & W's Post-Hr'g Br. at 32 n.70; Ellett's Post-Hr'g Br. at 13 n.16. But the Court cannot simply cast aside the plain language of the Sale Order based on this evidence. To do so would be contrary to Supreme Court precedent. In Travelers , certain statements in the record appeared to support one party's contention that it believed a court order meant something different from what its plain language showed it to mean. Despite the party's belief, "the plain terms of [the] court order" were "entitled to their effect" just as "an unambiguous private contract must be enforced irrespective of the parties' subjective intent." Travelers , 557 U.S. at 150, 129 S.Ct. 2195. So too here. Notwithstanding Mr. Johnson's purported belief, the plain terms of the Sale Order must be enforced, and the Debtor and the Committee accordingly must be permitted to object to the Notice of Designation for any reason.
3. Summary of the Plain Language of the Sale Order
To summarize, the Debtor and the Committee have the right to object to the *807 assumption and assignment of the Distributor Agreement for any reason because:
• The "notwithstanding" clause of ¶ 19 of the Sale Order overrides conflicting provisions of § 2.5(a) of the APA.
• By affording the Debtor and the Committee the right to object to the Notice of Designation for any reason and establishing procedures for adjudicating objection, ¶ 19 is inconsistent with § 2.5(a).
• Paragraph 19 imposes no limitations whatsoever on the nature of the objections that the Debtor and the Committee may assert, but instead permits them to object "for any reason," which means every reason without restriction.
• Other than § 2.5(a) of the APA, which must give way to ¶ 19 of the Sale Order, nothing in the rest of the APA is inconsistent with the Debtor's and the Committee's right to object to the Notice of Designation for any reason.
• By making the Notice of Designation "subject to" the right of the Debtor and the Committee to object, ¶ 19 makes clear that the designation must withstand the objection process laid out in ¶ 19 and the assumption and assignment approved by the Court in order for it to become effective.
D. Extrinsic Evidence
Because the Sale Order is unambiguous, it would be inappropriate to interpret it using extrinsic evidence. Reese , 138 S.Ct. at 766 ("When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further." (quoting M & G Polymers USA, LLC v. Tackett , --- U.S. ----, 135 S.Ct. 926, 938, 190 L.Ed.2d 809 (2015) (Ginsburg, J., concurring))). Nothing that follows should be read to reflect any doubts about the conclusion that the Sale Order unambiguously permits the Debtor and the Committee to object to the assumption and assignment of the Distributor Agreement for any reason. Nor is the Court "bypass[ing] the bedrock doctrine that a court considers extrinsic evidence of intent only after it finds the pertinent contract provision or provisions ambiguous." Watkins v. Honeywell Int'l, Inc. , No. 3:16CV01925, 2016 WL 7325161, at *6 n.8 (N.D. Ohio Dec. 16, 2016), aff'd , 875 F.3d 321 (6th Cir. 2017).
For purposes of this part of the opinion, however, the Court will assume ambiguity exists and that it therefore may consider "extrinsic evidence-additional evidence that reflects the intent of the contracting parties-to help construe [the Sale Order]." AmTrust , 694 F.3d at 750 (quoting Wulf v. Quantum Chem. Corp. , 26 F.3d 1368, 1376 (6th Cir. 1994) ). Extrinsic evidence includes evidence that allows a court to "put [itself] in [the parties'] place and discern if possible the objects they had in view and the motives which dictated their choice of words." In re Avon Sec. Litig. , No. 91 Civ. 2287 (LMM), 2004 WL 3761563, at *5 (S.D.N.Y. Mar. 29, 2004) (quoting Halsted v. Globe Indem. Co. , 258 N.Y. 176, 179 N.E. 376, 377-78 (1932) ), aff'd sub nom. Elliott Assocs., L.P. v. Avon Prods., Inc. , 121 F. App'x 916 (2d Cir. 2005).
"[A]ll contracts ... should be interpreted to carry out the parties' collective intent." Greco v. Dep't of the Army , 852 F.2d 558, 561 (Fed. Cir. 1988). If extrinsic evidence could be considered, it would strongly support the conclusion that the parties' collective intent could not possibly have been to give Ellett the unfettered right to designate the Distributor Agreement for assumption and assignment beyond the deadline established by the APA. Mr. Sweigart testified convincingly on behalf of the Debtor and the Committee *808 regarding the critical importance that the right to object for any reason had for them. When the potential designation of the Distributor Agreement was raised on the morning of the sale hearing, the elimination of the Preference Claim was "front and center" as to why the Debtor and the Committee were opposed to the designation. Tr. at 172. Considering the magnitude of the concern-it potentially was a $ 4.2 million issue-there is no way that the Debtor and the Committee would have agreed to an extension of Ellett's absolute right to designate the Distributor Agreement past the APA's deadline. The evidence thus overwhelmingly establishes that the Debtor and the Committee would not have agreed to extend Ellett's deadline to exercise its absolute right to designate the Distributor Agreement for assumption and assignment, and they indeed negotiated terms under which they had the right to object to the designation "for any reason." On the other side of the ledger, although Mr. Johnson made the bald assertion that he believed ¶ 19 to be an extension of Ellett's absolute right to designate the Distributor Agreement for assumption and assignment, he did not back up that assertion with any evidence. And he even conceded that Ellett likely would have closed the sale transaction without ¶ 19's inclusion in the Sale Order.
S & W and Ellett assert that the Debtor and the Committee could have done more to keep the Distributor Agreement from being assigned to Ellett-for example, by including in the APA or an amendment thereto a provision expressly excluding the Distributor Agreement from being an Assigned Contract. S & W's Post-Hr'g Br. at 29; Ellett's Post-Hr'g Br. at 2. But after considering all the evidence and taking into account the credibility of the witnesses, the Court is persuaded that the Debtor and the Committee did not do more for several reasons: They believed (wrongly) that the Distributor Agreement was not executory; Ellett was a party to its own distribution agreement with S & W and had every reason to believe that Debtor was as well; Ellett never expressed any interest in the Distributor Agreement during the three to four months that it had to conduct due diligence; the Distributor Agreement was unlike any of the other contracts that Ellett was designating for assumption and assignment; and the Debtor had no other reason to believe that the possibility of the Distributor Agreement's being assigned was even on the table until shortly before the sale hearing. All this explains why the Debtor and the Committee did not do more before the sale hearing to ensure that the Distributor Agreement was not being assumed and assigned. The Court is also persuaded that the reason the Debtor and the Committee did not raise the issue during the sale hearing was because statements made by Mr. Johnson on behalf of Ellett before the hearing led them to believe that Ellett, despite S & W's pressure, would not be seeking the assumption and assignment of the Distributor Agreement. Their belief would have been confirmed when they heard S & W's counsel, reporting the terms on which S & W's objection to the sale were resolved, state that "[his] understanding from counsel to Ellett is that [the Distributor Agreement] is not being assumed." Ex. 9 at 16.
Further, the fact that the Debtor and the Committee could have done more does not negate the effect of what they did, which is obtain a provision in the Sale Order giving them the right to object to the Notice of Designation for any reason. And contrary to S & W's suggestion that the Debtor and the Committee should have appealed the Sale Order or sought a stay of it after the Notice of Designation was filed, S & W's Post-Hr'g Br. at 41, there was no reason for them to do so. Setting *809 aside the question of whether an appeal would have been moot as the result of the closing that occurred nearly a week before the filing of the Notice of Designation, there was no reason for the Debtor or the Committee to appeal given that they had obtained a right to object for any reason.
S & W makes much of the fact that the Debtor's board of directors passed a resolution approving the APA and that the APA granted Ellett the unfettered right to designate executory contracts for assumption and assignment. Id. at 36-42. But the board approved a transaction that granted Ellett the absolute right to designate contracts for assumption and assignment only up through two days before the closing. Ellett failed to meet the deadline, and there is no evidence that the board of directors or anyone else acting on the Debtor's behalf ever approved giving Ellett the absolute right to make such a decision after the deadline imposed by the APA expired. To the contrary, the evidence shows that the Debtor did not give Ellett that right, but instead obtained its own right to object to the designation for any reason.
E. The Objections to the Assumption and Assignment of the Distributor Agreement
The analysis thus far has established that the Distributor Agreement is an executory contract and that, by comparison to other executory contracts in this case, it is sui generis in that the Debtor and the Committee had the right to object to its assumption and assignment for any reason. In deciding whether their objections should be sustained, the Court must "examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp. ), 4 F.3d 1095, 1099 (2d Cir. 1993) ; accord In re Evans Coal Corp. , 485 B.R. 162, 167 (Bankr. E.D. Tenn. 2013). The "standard rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage and will reject contracts whose performance would benefit the counterparty at the expense of the estate." COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.) , 524 F.3d 373, 383 (2d Cir. 2008).
The primary reason the Debtor and the Committee object to the Notice of Designation is the concern that S & W would assert the assumption and assignment of the Distributor Agreement as a complete defense to the Preference Claim.[12] Their concern is warranted. S & W's conduct both before and after the Petition Date demonstrates that it is pressing for the assumption and assignment of the Distributor Agreement not primarily to facilitate the distribution of the Free Goods to dealers, but instead to obtain a complete defense to the Preference Claim. During the hearing on the Notice of Designation, Ms. McPherson *810 clearly signaled S & W's intent to defend against the Preference Claim in that fashion, Tr. at 136, and S & W's post-hearing brief again made its intentions clear, stating that "[t]he impact of such an assignment on the right of [the Debtor] to continue to pursue [the Preference Claim] against S & W is a matter of well-settled law (i.e. , assignment gives rise to an absolute defense to any such claim)," S & W's Post-Hr'g Br. at 39.
Indeed, the case law supports the Debtor's and the Committee's concerns that S & W could make good on its plan of obtaining the dismissal of the Preference Claim by asserting the assumption and assignment of the Distributor Agreement as a defense. Several courts of appeal have held that the assumption of a contract bars the recovery of preferential transfers made under the contract. See Kimmelman v. Port Auth. of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.) , 344 F.3d 311, 314 (3d Cir. 2003) ; In re Superior Toy & Mfg. Co., Inc. , 78 F.3d 1169, 1174 (7th Cir. 1996) ; Alvarado v. Walsh (In re LCO Enters.) , 12 F.3d 938, 944 (9th Cir. 1993) ); see also Compton v. Mustang Eng'g Ltd. (In re MPF Holding U.S. LLC) , 495 B.R. 303, 322 (Bankr. S.D. Tex. 2013) ("The contract assumption defense [to the preference action] stems from In re Superior Toy & Mfg. Co. , a case [in which] the Seventh Circuit Court of Appeals ... held that a trustee could not bring a preference suit to recover payments made pursuant to an executory contract that was assumed."). Although the Sixth Circuit has not squarely addressed the issue, it has, in the context of noting that an adversary proceeding was stayed pending the outcome of the appeal before it, recognized that "pre-petition payments are generally not recoverable under 11 U.S.C. § 547 if the ... contracts were assumed and assigned under § 365." Kohut v. United Healthcare Ins. Co. (In re LSC Liquidation, Inc.) , 699 F. App'x 503, 506 (6th Cir. 2017) (citing Superior Toy for the proposition that "[§] 547 and § 365 are mutually exclusive avenues for a trustee").
Thus, if the Distributor Agreement were assumed and assigned to Ellett, S & W almost certainly would on that basis alone, without the merits being reached, prevail on the Preference Claim. On the other hand, if the assumption and assignment of the Distributor Agreement is not approved, the Debtor's estate will retain the Preference Claim for the benefit of unsecured creditors. See In re ABC-Naco, Inc. , 483 F.3d 470, 475 (7th Cir. 2007) ("Since the purchase agreement was not assumed, the unsecured creditors were not precluded from seeking the return of the payments as preferential transfers, and, as discussed above, because ABC-Naco did not receive new value, the unsecured creditors may recoup the payments.").
Affording S & W a complete defense to the Preference Claim without reaching the merits of the claim would harm the Debtor's bankruptcy estate. Any recovery on the Preference Claim-whether through litigation or settlement-will benefit the bankruptcy estate by increasing the distributions to creditors. This would be true even if the other defenses asserted by S & W caused the recovery to be less than the approximately $ 4.2 million amount of the Preference Claim and even though the amount distributable to creditors from the recovery would be reduced by the fees and costs incurred in obtaining the recovery. The Court, of course, has no way of knowing how much, if anything, the estate will recover on the Preference Claim. But the "ability to make a claim has value," Gascho v. Glob. Fitness Holdings, LLC , 822 F.3d 269, 288 (6th Cir. 2016), and taking this value away from the estate by providing S & W a complete defense to the Preference *811 Claim could only harm the Debtor's bankruptcy estate.
S & W contends that the Debtor and the Committee are estopped from objecting to the assumption and assignment of the Distributor Agreement based on this harm because they are "seek[ing] to undo the effects of the Sale Order." S & W's Pre-Hr'g Br. at 33. But as discussed above, the Debtor and the Committee are not seeking to undo the effects of the Sale Order; they instead are seeking to enforce its terms. And the case on which S & W bases its estoppel argument- In re Teligent, Inc. , 306 B.R. 752 (Bankr. S.D.N.Y. 2004), aff'd sub nom. Unsecured Claims Estate Representative of Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent, Inc.) , 326 B.R. 219 (S.D.N.Y. 2005) -is wholly inapposite.
In Teligent , the debtors filed a motion to assume an executory contract with Cigna Healthcare. While the motion remained pending, the debtors' Chapter 11 plan was confirmed, resulting in the appointment of a representative for unsecured creditors tasked with bringing actions on their behalf under Chapter 5 of the Bankruptcy Code. Id. at 755. Neither the estate representative nor any other party opposed the motion to assume the Cigna contract, and the bankruptcy court entered an order authorizing its assumption. Then, nearly seven months after the entry of the assumption order, the estate representative commenced an adversary proceeding against Cigna to avoid and recover alleged multimillion-dollar preferential transfers. Cigna moved to dismiss the preference complaint by "invoking the well-settled doctrine that a preference action may not be maintained for payments made in connection with an assumed executory contract." Id. at 756. Attempting "to deprive Cigna of its principal defense to a preference action," the estate representative brought a motion to vacate the order authorizing the assumption of the Cigna contract under Rule 60(b)(6) of the Federal Rules of Civil Procedure, which permits a court to relieve a party from a final order for "any other reason justifying relief from the operation of the judgment." Id. at 754, 758. To have an order vacated under Civil Rule 60(b)(6), "the movant must show extraordinary circumstances or an extreme and undue hardship." Id. at 758. According to the estate representative, relief from the order approving the assumption was justified because the unsecured creditors "would suffer undue hardship if the [a]ssumption [o]rder barred the [r]epresentative from pursuing the preference action." Id. at 757.
In denying the motion to vacate, the Teligent court was prompted by facts that have no parallel in this case. As an initial matter, the Teligent court found that Cigna and the debtors, as well as the debtors' employees, changed their position as the result of their reasonable reliance on the order approving the assumption, id. at 760, which simply could not have happened here. The Sale Order gave the Debtor and the Committee the right to object to the assumption and assignment of the Distributor Agreement for any reason, and none of the findings of the Sale Order could possibly apply to the Distributor Agreement unless and until the Court were to approve its assumption and assignment. Accordingly, neither S & W, Ellett, nor anyone else could have reasonably relied on the Sale Order as providing for the assumption and assignment of the Distributor Agreement. The Teligent court also found that the estate representative had "not shown the 'extraordinary circumstances' or 'undue hardship' necessary to succeed under Rule 60(b)(6)" because "the possibility of a greater distribution to creditors does not create a basis for relief under Rule 60(b)(6)." Id. at 761. That ruling has no applicability here because the *812 Debtor and the Committee are not seeking to vacate an order, but instead are seeking to enforce it. Further, the bankruptcy court's ruling in Teligent - that "the possibility of a greater distribution to creditors" did not provide an adequate basis for vacating the assumption order-meant just that and no more. S & W's suggestion that the ruling should be extended to make the elimination of a potential preference recovery irrelevant to the decision whether to approve the assumption and assignment of a contract in the first instance, S & W's Pre-Hr'g Br. at 34-35, is simply a non sequitur .
Finally, S & W argues that "it is clear that the assumption and assignment [of the Distributor Agreement] provides the estate and its creditors with significant value that far outweighs any potential recovery on an alleged preference action against S & W." Id. at 36. But the arguments advanced in support of this position do not hold water. S & W first suggests that the assignment would eliminate "indemnification on account of existing claims, and ... on account of any unknown future claims that may arise." Id. It apparently is referring to the Debtor's obligation to "indemnify S & W for any and all damages arising from, among other things, third party claims brought against S & W and based on [the Debtor's] violation of the Distributor Agreement." Id. at 26. S & W also contends that the assignment would eliminate any warranty claims that dealers have against the Debtor. Id. at 36.
Unlike the Preference Claim, which was filed based on more than $ 4.2 million of payments that S & W concedes it received in February 2018, there is simply no evidence of record suggesting that any indemnification or warranty claims exist or are likely to be asserted against the Debtor. S & W introduced no evidence that the Debtor breached the Distributor Agreement in a manner that would give rise to third party claims against S & W for which the Debtor would be obligated to indemnify S & W. As to warranties, the Products that the Debtor sold included a warranty by S & W to consumers, Tr. at 83, 126, and the Debtor never received warranty claims directly from consumers, Tr. at 155-56. Furthermore, the Distributor Agreement provided that the Debtor "shall not make any representations or express warranties concerning the Products except those contained in Smith & Wesson prepared materials accompanying the Product," Distrib. Agreement ¶ 9.2, and this provision prohibited the Debtor from making representations to dealers or giving them express warranties that exceeded those provided by S & W. S & W offered no evidence establishing that the Debtor violated that provision, nor is there any evidence suggesting that either dealers or consumers would ever look to the Debtor rather than S & W for warranty coverage.[13]
The evidence also demonstrates that the Debtor's estate likely will not be required to pay the other claims on which S & W relies, which are the "claims of the dealers relating to the Free Goods that they are entitled to receive from [the Debtor.]" S & W's Pre-Hr'g Br. at 36. For while S & W introduced evidence regarding how important distributing the Free Goods is to its business, the evidence also shows that S & W would be able to distribute the Free Goods to the dealers through Ellett without the assumption and assignment of the *813 Distributor Agreement. Moreover, S & W has taken the position that the Free Goods belong to the dealers, not to the bankruptcy estate. The Court need not decide whether S & W's view is correct. S & W believes that it is, and a necessary corollary of its position is that the estate would have no claim against S & W for the Free Goods if S & W shipped them to the dealers. Given all this, if S & W means what it says, then it will ship the Free Goods to the dealers, and dealers will not need to seek to recover the Free Goods or their value from the bankruptcy estate.
Even if claims for the Free Goods were made against the estate, the assumption and assignment of the Distributor Agreement still would not benefit the Debtor's bankruptcy estate. The Court reaches this conclusion for several reasons. First, the prospect of dealers ultimately obtaining a recovery against the estate for the Free Goods is certainly no greater than the possibility that the estate will recover on the Preference Claim against S & W. Second, any claims by dealers would be prepetition claims paid pro rata at cents on the dollar with other unsecured claims. Third, S & W would be liable to pay any judgment against it on the Preference Claim in full. At best, then, the assumption and assignment of the Distributor Agreement might relieve the estate of several hundred thousands of dollars of claims that would be paid, if at all, only in small part while completely eliminating any chance the estate would have to recover on a multimillion-dollar claim that S & W would be required to pay in full. Giving up a potential recovery on a multimillion-dollar Preference Claim in exchange for relief from claims in a much smaller amount does not make economic sense from the perspective of the Debtor's bankruptcy estate.
VI. Conclusion
For all these reasons, the Court concludes that the assumption and assignment of the Distributor Agreement would not benefit the estate, but instead would benefit only S & W and Ellett at the estate's expense. The Debtor's and the Committee's objections to the Notice of Designation therefore are sustained.
IT IS SO ORDERED .

The Debtor's and the Committee's exhibits are each marked "I-A," "I-B," etc. For ease of reference, and because there are no exhibits designated "II-A," "II-B," etc., the Court dispenses with the "I-" prefix and will refer to each according to its primary letter designation.

Citations to the "Distributor Agreement" are to Exhibit 1.

In addition to the provisions that are the subject of these findings, S & W and Ellett point to other provisions of the Distributor Agreement-e.g., those relating to warranties and returns-that they contend make the agreement executory. Because no purpose would be served by addressing the parties' arguments regarding these additional provisions, the Court makes no findings with respect to them.

"S & W has asserted a claim against [the Debtor's bankruptcy] estate for $ 778,227.08 on account of goods sold but not paid for prior to the Petition Date." Stips. ¶ 17.

The APA defined the "RTG Assets" to mean "those assets to be sold by [the Debtor] to J.W. Shultz, LLC pursuant to that certain Asset Purchase Agreement dated April 27, 2018." APA at 8.

Other decisions in this district have discussed the historical development of the Countryman definition and the functional test. See Huntington Nat'l Bank Co. v. Alix (In re Cardinal Indus., Inc.) , 146 B.R. 720, 725-29 (Bankr. S.D. Ohio 1992) ; In re Structurlite Plastics Corp. , 86 B.R. 922, 925-28 (Bankr. S.D. Ohio 1988). For a more recent discussion of the development of these concepts, see John A.E. Pottow, A New Approach to Executory Contracts , 96 Tex. L. Rev. 1437, 1440-50 (2018). No jurisprudential purpose would be served by re-plowing this ground here.

The decisions on which the Debtor relies for the proposition that the relevant date is "the date on which the Court considers the request to assume or reject the contract," Debtor's Post-Hr'g Br. at 25, do not apply here. In those decisions, by the time the court could hold a hearing on motions to assume or reject, the contracts to be assumed or rejected had expired by their terms, making the assumption/rejection issue moot. See In re Pesce Baking Co., Inc. , 43 B.R. 949, 957 (Bankr. N.D. Ohio 1984) ("Although a[n] agreement may be executory on the date the debtor's bankruptcy petition is filed, once the agreement expires of its own terms, the debtor's application to reject it becomes moot."); Camp v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. (In re Gov't Sec. Corp.) , 101 B.R. 343, 349-50 (Bankr. S.D. Fla. 1989) (same), aff'd , 111 B.R. 1007 (S.D. Fla. 1990), aff'd , 972 F.2d 328 (11th Cir. 1992). Because the Distributor Agreement expired by its terms on April 30, 2019-after the hearing on the Notice of Designation-these decisions have no applicability here.

Cf. Cabot Corp. v. AVX Corp. , 448 Mass. 629, 863 N.E.2d 503, 513 (2007) (holding that "language in the letters of intent that '[i]t is [the buyer's] intention to purchase the following materials' is not a binding commitment ... to make any purchases at all" under "the long-established principle that a 'contract' to purchase an unspecified amount of goods is not a contract at all"); Gill v. Richmond Co-op. Ass'n , 309 Mass. 73, 34 N.E.2d 509, 513-14 (1941) ("The plaintiffs promised nothing except to buy such milk as they might order. The only measure of their promise was their own will. It was not like a promise to buy such milk as they might need in their business. Since the plaintiffs bound themselves to nothing, the defendant received no consideration for its promise to sell milk, and was not bound to sell any." (citations omitted)).

According to S & W, the Sixth Circuit "explicitly declined to apply the [f]unctional approach outside the context of rejection" in Rieser v. Dayton Country Club Co. (In re Magness) , 972 F.2d 689 (6th Cir. 1992). S & W's Post-Hr'g Br. at 21. That is not quite right. True, the Sixth Circuit stated that "because the trustee does not propose to reject the contract but wishes to assign it, it is not necessary to further explore the executory contract problem." Magness , 972 F.2d at 694. Read in context, however, it is evident that the Sixth Circuit did not sidestep the executoriness issue based on the inapplicability of the functional test in the assumption context. Rather, it did so because Ohio law excused the nondebtor party to the contract in that case "from accepting performance from or rendering performance to an entity other than the debtor," 11 U.S.C. § 3635(c)(1)(A), which would have made the contract unassignable even if it had been executory. For purposes of this decision, the Court assumes without deciding that the functional test applies in the context of assumption.

The Court pauses briefly here to note that Ellett uses this reference to time and date to argue that the only purpose of ¶ 19 was to extend its time to designate the Distributor Agreement for assumption and assignment. Ellett's Post-Hr'g Br. at 14. This argument ignores the rest of ¶ 19, which makes clear that it not only extended the deadline for Ellett to make the designation, but also afforded the Debtor and the Committee the right to object for any reason.

S & W and Ellett also rely on the order approving bidding procedures and its finding that the Debtor had provided "good and sufficient [business] reasons for the Court to ... approve the form of [s]talking [h]orse APA[,] [which] is identical in every meaningful way to the APA approved by the Sale Order-the definition of Assigned Contracts, Contracts, Purchased Assets, and the provisions governing assumption and assignment, including Sections 2.1 and 2.5." S & W's Post-Hr'g Br. at 29 n.79. S & W's and Ellett's reliance on the bidding procedures order is misplaced for two reasons. First, the Sale Order, which affords the Debtor and the Committee the right to object to the assumption and assignment of the Distributor Agreement for any reason, trumps the bidding procedures order. See Sale Order ¶ 38. Second, under the Sale Order, the Distributor Agreement is not an Assigned Contract or a Purchased Asset unless and until the Court approves its assumption and assignment.

The Committee also contends that the assumption and assignment of the Distributor Agreement should be disapproved because S & W and Ellett intend to distribute the Free Goods to the Debtor's former customers rather than distributing their value to all of the Debtor's creditors. According to Committee, this would contravene the Supreme Court's decision in Czyzewski v. Jevic Holding Corp. , --- U.S. ----, 137 S.Ct. 973, 197 L.Ed.2d 398 (2017). Comm.'s Post-Hr'g Br. at 7-11. Ellett and S & W argue otherwise. Ellett's Post-Hr'g Br. at 8-11; S & W's Post-Hr'g Br. at 8 n.6. Because the elimination of the Preference Claim provides reason enough for the Court to decline to approve the assumption and assignment of the Distributor Agreement, the Court need not address the parties' arguments regarding Jevic and the distribution of firearms.

Although Ellett's counsel suggested during closing argument that Ellett might assert claims for breach of the APA and fraud in the inducement if the assumption and assignment of the Distributor Agreement were denied after the Court found it to be executory, Tr. at 192, no evidence was presented during the hearing that Ellett would have any such claims.